**RED–EYED JACK, INC., a Florida corporation, doing business as Pink Pony, Plaintiff,**

v.

**CITY OF DAYTONA BEACH, a Florida municipal corporation, Defendant.**

**The Boulevard Del, Inc., a Florida corporation, doing business as Molly Brown's, Plaintiff,**

v.

**City of Daytona Beach, a Florida municipal corporation, Defendant.**

Nos. 6:01CV429ORL28KRS, 6:01CV761ORL28KRS.

United States District Court, M.D. Florida, Orlando Division.

June 1, 2004.

Suzanne Elizabeth Coe, Esq., Coe & Coe, LLC, New Orleans, LA, for Plaintiff.

Gary S. Edinger, Esq., Law Office of Gary Edinger, Gainesville, FL, Marie Simone Hartman, Esq., City of Daytona Beach, Daytona Beach, FL, for Defendant.

## ORDER

ANTOON, District Judge.

This cause came on for consideration without oral argument on the parties' cross-motions for summary judgment.[1] The City of Daytona Beach ("the City"), through its zoning ordinances, has attempted to regulate "adult businesses" in Daytona Beach. The central issue in the parties' motions for summary judgment is whether the City's zoning ordinances violate the Plaintiffs' First Amendment rights. For the reasons discussed below, the City's motion for final summary judgment is granted and The Boulevard Del, Inc.'s ("Boulevard Del") motion for partial summary judgment is denied.

## BACKGROUND [2]

The Plaintiffs in these consolidated cases, Boulevard Del and Red–Eyed Jack, Inc. ("Red–Eyed Jack"), operated two bars in Daytona Beach (Molly Brown's and The Pink Pony, respectively) that feature scantily clad dancers. Both Plaintiffs wanted to open establishments featuring totally nude dancers but believed that the City offered few, if any, locations for such use. Alleging, *inter alia*, that this scarcity of locations violated the requirements of the First Amendment, they filed the instant suits, which were consolidated on July 5, 2001 (Doc. 36).[3]

The City's efforts to regulate adult entertainment—and litigation in this federal district court related to those efforts—date back more than twenty years. In 1981, the City adopted a twofold approach to the regulation of adult businesses: First, the City enacted a regulation prohibiting nudity and sexual conduct in establishments where alcohol was served.[4] Second, the City enacted zoning regulations limiting

---

1. Defendant City of Daytona Beach's Motion for Final Summary Judgment (Zoning Claims) (Doc. 140), Defendant City of Daytona Beach's Memorandum in Support of Final Summary Judgment (Zoning Claims) (Doc. 141), Plaintiff The Boulevard Del's Motion for Partial Summary Judgment (Doc. 146), and Plaintiff The Boulevard Del's Memorandum of Law in Support of Motion for Partial Summary Judgment (Doc. 147). In considering these cross-motions for summary judgment, the Court has also considered Defendant City of Daytona Beach's Memorandum in Opposition to Boulevard Del's Motion for Final Partial Summary Judgment on Zoning Claims (Doc. 150). Neither of the Plaintiffs has filed a response to the City's motion.

2. Much of the background information contained in this Order is taken or adapted from this Court's Order of August 1, 2002 (Doc. 104).

3. Unless otherwise noted, all docket citations in this Order refer to the docket in case number 6:01–cv–429.

4. Enforcement of that regulation, now codified as Section 10–6 of the Daytona Beach City Code, was the subject of Count IV of the Second Amended Complaint (Doc. 96). However, that count was voluntarily dismissed, and a separate summary judgment motion (Doc. 130) filed by the City relating to that regulation was thus rendered moot. (*See* Docs. 156 & 157).

the locations at which adult businesses could operate. The Land Development Code of the City of Daytona Beach (the "LDC") defines an "adult theater," in pertinent part, as a use "which exhibits any motion picture, exhibition, live show, representation, or other presentation which, in whole or in part, depicts nudity." LDC, Art. 2, § 3.1. The zoning regulations adopted by the City permitted operation of such adult theaters as a matter of right in "Business Automotive" ("BA") districts. However, as detailed below, adult theaters were and are subject to distance requirements that prohibit their establishment within certain distances of churches, schools, and other adult theaters. The businesses operated by the Plaintiffs when they filed these suits did not fall into the adult theater category because they were not intended to exhibit nudity. However, the new businesses that they intended to operate, and have since opened (Doc. 104 at 8), are categorized as adult theaters under the LDC.

The City's zoning restrictions on adult businesses were upheld by this federal district court in *Function Junction, Inc. v. City of Daytona Beach*, 705 F.Supp. 544 (M.D.Fla.1987) (Sharp, J.), *aff'd*, 864 F.2d 792 (11th Cir.1988). The *Function Junction* plaintiffs had asserted that the City's zoning scheme provided a constitutionally insufficient number of sites where adult theaters could operate. *Id.* at 552. After hearing testimony that there were twelve sites available in Daytona Beach and that, after considering the effect of distance restrictions, it was possible for eight adult businesses to operate on those sites simultaneously, *id.* at 549, Judge Sharp concluded that the City had "adequately and reasonably provide[d] locations for the protected expression of nude dancing," *id.* at 552. Judge Sharp did not make an express determination as to the number of sites that were available for adult theaters. *See id.* At the time of the opinion in *Function Junction*, Daytona Beach consisted of approximately 31.5 square miles and had a population of 59,000. It has since almost doubled in geographic size, although much of this additional area is undeveloped. In contrast, the population has increased by only about 5,000. (Doc. 140 ¶¶ 37–39).

Some years after the *Function Junction* decision, Daytona Beach's zoning regulations were again unsuccessfully challenged by the operator of an adult bookstore. *See Morgan v. City of Daytona Beach*, Case No. 93–30801, *consolidated with Morgan v. Bd. of City Comm'rs, Daytona Beach, Fla.*, Case No. 93–32064 (Fla. 7th Cir.Ct.) (Orfinger, J.), *aff'd*, 678 So.2d 352 (Fla. 5th DCA 1996). With respect to the plaintiff's challenge that the City afforded no reasonable alternative locations for his business, the *Morgan* court, relying on *Function Junction*, found that there were sufficient sites available in the BA districts and in other districts through a waiver process. *Id.* at 15–16.[5]

In 1993, the City adopted the LDC, which reformatted the adult business zoning regulations and permitted adult theaters to operate as a "conditional use" (rather than as of right) in BA districts and as a "special use" in any other district. Operation as a "conditional use" required approval from the City's Technical Review Committee; operation as a "special use" required public hearings and approval from the Planning Board and the City

---

**5.** As noted above, in *Function Junction* Judge Sharp did not conclude that any particular sites were available for use by an adult theater; rather, he simply concluded that Daytona Beach offered a constitutionally sufficient number of such sites. Hence, it is not apparent whether any of the sites that Daytona Beach contends are currently available for such use were "approved" by Judge Sharp.

Commission. Thus, the LDC prevented adult theaters from opening as of right anywhere in the city.

After filing their suits in April and June of 2001, respectively, Red–Eyed Jack and Boulevard Del sought preliminary injunctions against continued enforcement of the City's zoning scheme, arguing that the scheme amounted to an unconstitutional "prior restraint" on their First Amendment rights to convey a message of sexuality through nude dancing. On July 25, 2001, this Court concluded that the Plaintiffs were likely to prevail on their arguments that the City's zoning regulations failed to satisfy the First Amendment in two ways: they did not require prompt decisionmaking by officials reviewing requests to operate adult businesses, and they did not provide for prompt repair to the courts for those whose requests had been denied. The Court temporarily enjoined (Doc. 43) the City from enforcing Article 11, Section 4.1 and Article 17, Section 2.1 of the LDC. The former section permits adult theaters in BA districts subject to distance requirements; the latter permits such uses in any district, but requires City approval after a public hearing. The Court subsequently granted (Doc. 55) a motion for reconsideration by the City, replacing that injunction with an injunction against enforcement of Article 4, Section 7 of the LDC (pertaining to the approval of conditional uses by the Technical Review Committee) against adult theaters.

Some time after entry of the July 25, 2001 Order, Plaintiffs opened adult theaters at or very near their previous locations, offering fully nude dancing. In addition, another entity opened an adult bookstore in Daytona Beach, and other businesses submitted requests to operate adult theaters or bookstores. All told, in the wake of the July 25, 2001 Order, the City became aware of at least ten businesses either operating or applying to op-

erate adult theaters or bookstores in Daytona Beach. (Doc. 140 ¶ 33).

On September 5, 2001, the City amended the LDC, eliminating the role of the Technical Review Committee in approving requests to operate adult businesses in BA districts. On October 17, 2001, the City created a new zoning district category, the M–5 (Heavy Industrial) Zoning District, and applied it to twenty acres of mostly undeveloped land in the western part of the City. Within this new district—the "Original M–5 District"—adult businesses could open and operate as of right without the distance requirements that applied within the BA District.

The City owned a one-acre well site within the Original M–5 District, while the remaining nineteen acres were privately owned and for sale. Two paved roads ran adjacent to the new district, with an unpaved portion of one of those roads bisecting it. According to the City, eleven to eighteen sites were available for use by adult businesses within the Original M–5 District, in addition to seven available sites within BA districts. Thus, the City contended that, in total, there were eighteen to twenty-five sites within Daytona Beach where an adult business could operate as of right.

In November 2001, Boulevard Del sought a second preliminary injunction, seeking to bar the City's enforcement of its newly amended Land Development Code. Boulevard Del contended that Daytona Beach offered at most a single site on which an adult business could open and operate as of right. (Doc. 56 ¶ 5). After an evidentiary hearing, the Court agreed that at that time Daytona Beach offered only one such site (Doc. 104 at 12); the Court found only one available BA District site and no available sites in the M–5 District.

After considering such factors as Daytona Beach's geographical size, municipal

character, and total population, as well as the number of adult businesses (ten) that had either opened or applied for adult business licenses since July 2001, the Court concluded that the First Amendment required that additional sites be made available for adult expression.[6] *Id.* at 34. Thus, the Court entered a limited preliminary injunction allowing continued operation of Molly Brown's and The Pink Pony at "their current locations and zones pending the City's provision of sites for constitutionally protected adult expression in a M–5 district and/or BA district." *Id.* at 39.

**Developments Since Entry of Second Preliminary Injunction**

Subsequent to the entry of that injunction, the City made a number of changes to its zoning scheme. In December 2002, the City altered its Comprehensive Plan, including the Future Land Use Map and the Neighborhood V Policies in the Future Land Use Element of its Plan. (Doc. 140 at 2; 4th Prioletti Aff., Doc. 144, at 2). The alterations included the deletion of a provision in section (e) of the Neighborhood V Policies which had stated that "development shall be limited to institutional and industrial uses which do not rely on retail traffic or access by the general public." (4th Prioletti Aff. at 2). Additionally, the "General industry" area located in Neighborhood V at indian Lake and Tiger Bay

Roads was expanded when the future land use designation of 298 acres at that junction was altered from "Urban Transition" to "General Industry." (Doc. 140 at 2; 4th Prioletti Aff. at 2). On February 20, 2003, the City deleted all provisions relating to the Technical Review Committee from the LDC. (Doc. 140 at 2; 4th Prioletti Aff. at 2).

On May 7, 2003, the City rezoned to "M–5" a 190–acre parcel adjacent to the Original M–5 District. (Doc. 140 at 2–3; 4th Prioletti Aff. at 3). The City also approved a preliminary plat for a subdivision in the resulting 210–acre M–5 District (the "Current M–5 District") of approximately fifty-five acres straddling Indian Lake Road.[7] (Doc. 140 at 3; 4th Prioletti Aff. at 3–4). The subdivision was to include twenty-eight lots, twenty-four of which would be one-acre development lots with frontage on Indian Lake Road. (Doc. 140 at 3; 4th Prioletti Aff. at 3–4).

On March 29, 2004, the parties were ordered to advise the Court whether the plat of the twenty-four lots in the Current M–5 District had yet been finalized. (Doc. 166). The Plaintiffs responded (Doc. 169) by stating that the plat had not yet been finalized but that the issue of finalization had been set for consideration at the April 7, 2004 City Commission meeting. (Pls.' Joint Resp. to Order Regarding Platting of Lots, Doc. 169, at 3).[8] The City's response

---

**6.** However, the Court did not find that the Plaintiffs were likely to prevail on their argument that they had been "grandfathered in" as lawful, nonconforming uses at their original locations. The Court found that there was no evidence in the record that either of the Plaintiffs had ever offered nude dancing so as to qualify as a non-conforming use and that the Court's July 25, 2001 Order merely barred enforcement of the zoning scheme rather than establishing the offering of nude dancing by either Plaintiff as a lawful use. (Doc. 104 at 35–36).

**7.** Volusia County paved Indian Lake Road through both the Original and Current M–5 districts in late 2002/early 2003. (Doc. 140 at 3; 4th Prioletti Aff. at 3).

**8.** The Plaintiffs recently submitted the April 8, 2004 deposition of Richard Prioletti in support of their summary judgment arguments. (Doc. 171, filed April 8, 2004). The Plaintiffs have not directed the Court to any particular portions of that deposition. In any event, the Court has reviewed the deposition, and nothing in it alters the Court's conclusions as to the availability of the twenty-four Current M–

to the Order (Doc. 172), which was filed after the City Commission meeting was held, notes that at the meeting the City Commission adopted a resolution "grant[ing] final plat approval for the subdivision and approv[ing] a standard form contract for Plat Recording." (Doc. 172 at 1). A copy of the form contract is attached to the City's response.

The City also contends (and the Plaintiffs have not disputed) that, despite a contrary finding in the second preliminary injunction order (Doc. 104), telephone and power lines have been installed through the interior of the M–5 District along the since-paved portion of Indian Lake Road. (Doc. 140 at 3). In addition, city water and sewer lines have been installed up to the boundary of the Current M–5 District. *Id.*

The City now moves for summary judgment on the zoning-related claims of both Plaintiffs, arguing that it has provided sufficient alternative avenues for adult expression. Boulevard Del responds with its own motion for partial summary judgment, arguing that the zoning scheme alterations have not cured the original defects and re-raising the argument that it has been "grandfathered in" so as to be entitled to offer adult expression at its current location.

## DISCUSSION

### I. Summary Judgment Standards

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of establishing that no genuine issues of material fact remain.

5 District sites or as to any other issue ad-

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. 2548.

In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249, 106 S.Ct. 2505.

### II. Analysis

▮ The analysis begins here, as it did in the August 1, 2002 Order (Doc. 104), with recognition that conveyance of a message of sexuality through nude dancing has been consistently recognized as a form of "expressive conduct within the outer perimeters of the First Amendment." *Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 566, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) (plurality opinion); *Flanigan's Enters., Inc. of Ga. v. Fulton County, Ga.,* 242 F.3d 976, 982 (11th Cir.), *reh'g and reh'g en banc denied,* 254 F.3d 77 (11th Cir.2001), *cert. denied,* 536 U.S. 904, 122 S.Ct. 2356, 153 L.Ed.2d 178, *and reh'g denied,* 536 U.S. 976, 123 S.Ct. 2, 153 L.Ed.2d 866 (2002). "For First Amendment purposes, courts treat zoning ordinances regulating adult businesses as time, place, or manner restrictions." *David Vincent, Inc., v. Broward County, Fla.,* 200 F.3d 1325, 1333 (11th Cir.2000) (citing *City of Renton v.*

dressed herein.

*Playtime Theatres, Inc.,* 475 U.S. 41, 46, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986)). "Zoning ordinances that target the social ills associated with adult entertainment are constitutional if they are narrowly tailored to further a substantial government interest and 'allow for reasonable alternative avenues of communication.'" *Id.* (quoting *Renton,* 475 U.S. at 50, 106 S.Ct. 925). It is the latter point that is primarily at issue in the instant case.

■ "Whether a zoning ordinance leaves open reasonable alternative avenues of expression depends on how many sites are available." *Boss Capital, Inc. v. City of Casselberry,* 187 F.3d 1251, 1253 (11th Cir.1999) (citing *Lady J. Lingerie, Inc. v. City of Jacksonville,* 176 F.3d 1358, 1361 (11th Cir.1999)). Without conceding that it ever failed to offer sufficient sites for adult uses, the City contends that it now does so. Boulevard Del, however, argues that various factors, detailed below, make it impossible or prohibitively unreasonable to open or operate adult businesses on any of the sites allegedly made available by the City. The parties agree that as of September 2003, a total of ten adult businesses were operating or seeking permission to operate in Daytona Beach.[9] (Doc. 140 at 9). This figure includes the two nude clubs operated by the Plaintiffs and at least one currently-operating adult bookstore.

### A. Sites Available in BA Districts

Throughout this litigation, the City has identified seven existing BA District sites as available for adult businesses: 1011 Mason Avenue, 1051 Beville Road, 1590 South Nova Road, 1600 Nova Road, 1720 Mason Avenue, and two sites at 1700 Mason Avenue. The Plaintiffs counter that, among other problems, distance requirements applicable to adult businesses render all of these BA District sites unavailable.

There are two different sources of distance requirements that impact the instant case. Article 11, Section 4.1 of the LDC governs conditional uses of adult bookstores and adult theaters in BA districts and provides, in pertinent part:

(a) It shall be unlawful to locate any adult bookstore or adult theater within 400 feet of any residential, R–PUD, T–1, or T–2 district.

(b) It shall be unlawful to locate any adult bookstore or adult theater within 1,000 feet of any other adult theater or adult bookstore.

(c) It shall be unlawful to locate any adult bookstore or adult theater within 400 feet of any church, school, public park, or playground, or any other public or semipublic place of assembly where large numbers of minors regularly travel or congregate.

(d) Distances shall be measured from property line to property line, without regard to the route of normal travel.

Second, Section 847.0134, Florida Statutes, provides in pertinent part that "an adult entertainment establishment that ... presents live entertainment or a motion picture, slide, or other exhibit that, in whole or in part, depicts nudity ... may not be located within 2,500 feet of the real property that comprises a public or private elementary school, middle school, or sec-

---

**9.** Boulevard Del contends that this figure is artificially depressed due to the City's past failure to provide sufficient adult business sites. However, it is at least as likely that the current uncertainty is more likely to have *increased* applications than depressed them.

In the absence of anything other than speculation as to the validity of this figure, the Court will assume that it accurately represents the number of entities operating or intending to operate adult businesses in Daytona Beach.

ondary school unless the ... municipality approves the location under proceedings as provided in ... [section] 166.041(3)(c) ...."[10] A violation of Section 847.0134 constitutes a third-degree felony.

Whether any of the seven sites located in the BA District are available for use by adult businesses requires independent analysis.

### 1. 1051 Beville Road, 1590 South Nova Road, 1600 Nova Road

These three sites (the "Beville/Nova Sites") are located within 1000 feet of one another and therefore, pursuant to Article 11, Section 4.1(b) of the LDC, cannot accommodate more than a single adult business at one time. While acknowledging the distance requirements, the City contends that all three sites should nevertheless be considered available. Relying on *Diamond v. City of Taft*, 215 F.3d 1052 (9th Cir.2000), *cert. denied*, 531 U.S. 1072, 121 S.Ct. 763, 148 L.Ed.2d 665 (2001), the City argues that the appropriate inquiry is how many total sites are available rather than how many adult businesses might simultaneously operate on them.

The *Taft* case, however, dealt with a single entrepreneur seeking to open the first adult business in a small (population 6,800) town. Logically, when only one entity has applied to operate an adult business in a particular municipality, the theoretical question of how many adult businesses might operate simultaneously in that municipality is irrelevant for First Amendment purposes. The *Taft* court recognized that it was dealing with an exception to the general rule, which requires consideration of limits on simultaneous operation: "Generally, in cases where there is a restriction on the distance between adult businesses, a proper

measure of sufficiency can only include the number of sites that could coexist .... Under the[ ] circumstances, however, we are only concerned with [the single entrepreneur's] ability to open an adult business." *Id.* at 1058.

The City argues that application *Taft* to the circumstances of this case renders all three Beville/Nova Sites available because the Plaintiffs in this case, like the plaintiff in *Taft*, are seeking to open new adult businesses rather than being forced by rezoning to relocate existing businesses. However, the *Taft* court made it clear that it was the absence of other adult businesses—not the facts underlying the entrepreneur's application—that made the situation exceptional:

> As the first person to seek to open an adult business in Taft, [plaintiff] is not limited by the 1,000–foot restriction in choosing a site for his business. He can choose among all seven sites. *Others who follow [plaintiff] will be limited by the restriction, but he is not. Under these circumstances, we need only examine the total number of sites available.*

*Id.* at 1057–58 (emphasis added).

As noted above, ten adult businesses are either operating or seeking to operate in Daytona Beach. *Taft* provides no basis for ignoring the effects of distance requirements in such a situation. As such, and because it is undisputed that the Beville/Nova Sites are within 1,000 feet of one another and therefore could house at most one adult business at any one time, these locations offer at most only a single site at which an adult business may operate as of right.

---

10. Section 166.041(3)(c), Florida Statutes, governs notice and other procedural requirements for consideration of municipal ordi-

nances that would change the zoning of particular parcels or change the uses permitted within particular zoning classifications.

Boulevard Del argues that the Beville/Nova Sites are entirely unavailable because they are too close to the Nova Village Shopping Center, which houses two churches. As noted above, Article 11, Section 4.1 of the LDC bars adult businesses from operating within 400 feet of a church and requires that the distance be measured "property line to property line." It is undisputed that the property lines of each of the Beville/Nova Sites are less than 400 feet from the property line of the Nova Village Shopping Center. However, the Court again concludes that the appropriate property line for this measurement is not that of the entire multi-tenant center but of the particular tenants—the churches—whose presence in the center creates the potential problem. (See Doc. 104 at 15–17). In the case of a multi-tenant shopping center, the churches' "property" is the space that they have leased, not the entire parcel that their landlord owns. In the instant case, the churches' property lines are more than 400 feet from the property lines of the Beville/Nova Sites. Thus, there is one available Beville/Nova Site.

### 2. 1700 Mason Avenue and 1720 Mason Avenue

The two Mason Avenue addresses listed above contain three potential adult business sites (the "Mason Avenue Sites"): 1700 Mason Avenue, Lot 12; 1700 Mason Avenue, Lot 13; and 1720 Mason Avenue. However, in addition to being located within 1,000 feet of one another, thus barring operation by more than one adult business at a time, the Mason Avenue Sites are all located within 400 feet of a residential district. As such, Article 11, Section 4.1 of the LDC prohibits an adult business from operating at any of these sites.

The City contends that the Mason Avenue Sites should nonetheless be considered "available" for adult uses because each could be subdivided to create some smaller parcels with property lines at least 400 feet distant from the residential district. Similarly, the City argues that these sites could contain compound uses, with the more distant portion of each site available for an adult business use. However, as was the case in the August 1, 2002 Order, the Court again concludes that the possibility of subdivision or multiple uses does not necessarily render these sites "available" to adult businesses under *Renton*.

Relying on *David Vincent*, the City argues that the need to subdivide a property does not render that site unavailable for First Amendment purposes. It is true that in *David Vincent* the Eleventh Circuit discussed distance requirements and a need to subdivide property before dismissing the plaintiffs' concerns about being denied "the necessary permits to redevelop sites for adult businesses" as "entirely speculative." 200 F.3d at 1335. However, it is not clear that distance requirements would have forced adult business operators to subdivide any property. The *David Vincent* court also dismissed the plaintiff's concerns about having to purchase larger lots than they wanted for their businesses, *id.;* In other words, the plaintiffs' "need" to subdivide may have been driven by economic considerations rather then legal necessity. In any event, it is clear that the *David Vincent* court did not hold that a need for subdivision can never render property unavailable for adult uses. *See id.*

The August 1, 2002 Order determined that (1) "obtaining approval to subdivide or establish a compound use involves discretionary decision-making by City staff" and (2) the staff's role in this process constituted a prior restraint on adult businesses needing such approval to open. (Doc. 104 at 18). Although, as discussed above, it appears that the role of the Technical Review Committee in this process has been

eliminated, the City does not argue that discretion has also been eliminated from the process required to gain approval to subdivide real property. As such, the Court concludes once again that these sites should not be considered "available" to adult business owners. *See also Levi v. City of Ontario,* 44 F.Supp.2d 1042, 1050 (C.D.Cal.1999) (excluding seven sites that required subdivision from analysis under *Renton* and stating that "[i]t strains credulity to believe that sites on which an adult business cannot legally operate are reasonable adequate alternatives").

### 3. The Flag–Shaped Lot

The final potential BA District site, located at 1011 Mason Avenue, has been referred to throughout this litigation as the "Flag–Shaped Lot." The Flag–Shaped Lot is undisputedly located within 400 feet of a school and a residential district and is thus unavailable for adult use without subdivision. As it did with regard to the Mason Avenue Sites, the City argues that the Flag–Shaped Lot should be considered available because subdivision could create at least one parcel that would meet the distance requirements of the LDC. The Court disagrees for the same reasons set forth above in regard to subdivision of the Mason Avenue Sites. In addition, the Court reiterates its conclusion that the Flag–Shaped Lot runs afoul of Section 847.0134, Florida Statutes, which bars adult businesses from locating within 2,500 feet of a school unless the applicable government "approves the location" via proceedings meeting certain procedural requirements. The City argues that it met the requirements of Section 847.0134 for "approving" the Flag–Shaped Lot when it passed the ordinance permitting adult businesses in all BA Districts. However, this argument contradicts the plain language of the statute, which requires approval of a particular location rather than an entire district. In addition, the logical

extension of the City's argument is that *every* zoning ordinance that permits adult uses would demonstrate the necessary "approval" and trump Section 847.0134; such an extension would effectively nullify that statute.

### B. Sites Available in the M–5 District

At the time of the hearing regarding the second preliminary injunction, the City argued that it had made between eleven and eighteen sites available to adult businesses in the Original M–5 District. (Doc. 162 at 3). Since that time, the City has expanded the M–5 zoning classification to encompass 190 additional acres. The City now contends that, even if no sites are available in the BA District, it has provided sufficient sites for adult expression within the expanded, Current M–5 District. It is not clear exactly how many such sites the City now contends it has created within the Current M–5 District, but the City's approval of "a preliminary plat of twenty-four one[-]acre development lots with street frontage," (Doc. 141 at 15), suggests that this number is at least twenty-four. Boulevard Del counters that, for several reasons, no sites within the Current M–5 District are available. (Doc. 146 at 5).

In its Order on the motion for a second preliminary injunction, this Court agreed with the Plaintiffs that the Original M–5 District offered no sites for adult expression because operation of adult businesses in that district conflicted with the City's Comprehensive Plan. (Doc. 104 at 21). Moreover, the Court determined that all potential sites except those bordering Tiger Bay and Indian Lake Roads lacked sufficient infrastructure to be considered "available." Finally, the Court concluded that the absence of subdivision or approval for compound use within the district meant that, even if no other impediments existed,

only two sites—one on either side of the unpaved road—could be considered "available" for use by an adult business within the district. (Doc. 104 at 21–22). The City now argues that the problems identified by the Court have been cured.

### Inconsistency with the Comprehensive Plan

As explained by Florida's Second District Court of Appeal, "[i]n Florida, all zoning and development permitting must now be consistent with the comprehensive plan of the city or county in question. The comprehensive plan has been likened to a "constitution" and has been described as 'a limitation on a local government's otherwise broad zoning powers.'" *Lee County v. Sunbelt Equities, II, Ltd. P'ship*, 619 So.2d 996, 1003 (Fla. 2d DCA 1993) (citations omitted). The consistency of such zoning and development is to be evaluated pursuant to Florida law:

> A development order or land development regulation shall be consistent with the comprehensive plan if the land uses, densities or intensities, and other aspects of development permitted by such order or regulation are compatible with and further the objectives, policies, land uses, and densities or intensities in the comprehensive plan and if it meets all other criteria enumerated by the local government.

§ 163.3194(3)(a), Fla. Stat. (2003).

At the time of the Order on the motion for a second preliminary injunction, the Original M–5 District included two Future Land Use categories—the Urban Transition category and the Industrial category. Within the Urban Transition category, the Comprehensive Plan limited non-residential uses "to that necessary to support the residential demand generated within the urban transition area." However, there was no residential demand within the Original M–5 District. The Comprehensive Plan also limited development within the industrial category "to institutional and industrial uses which do not rely on retail traffic or access by the general public." These restrictions effectively barred adult businesses from the Original M–5 District: a lack of residential demand within the Urban Transition area precluded adult businesses from operating there, while reliance on retail traffic and general public access barred them from any portion designated Industrial. (Doc. 104 at 24–25).

As noted above, the City made several changes to address these issues. In addition to rezoning 190 acres adjacent acres to M–5, thereby creating the Current M–5 District, the City eliminated the "Urban Transition" designation from that district and amended the Neighborhood V policies to eliminate the prohibition on businesses relying on retail traffic or general public access. (*See, e.g.,* McLaughlin Aff., Doc. 149 ¶¶ 78–79). As a result of these changes, Boulevard Del agrees that the previous "Future Land Use" issues—i.e., the "residential demand" and "retail traffic" limitations—do not prohibit operation of adult businesses in the Current M–5 District. *Id.*

However, Boulevard Del now raises a new concern. Specifically, Boulevard Del points to Policy 1.1.2, which provides in pertinent part:

> **Policy 1.1.2.**
>
> The following description of the Future Land Use categories sets forth the dominant land use envisioned in each area on the Land Use Map. Other uses may be approved by the City in such areas in accordance with the City's land development regulations....
>
> **INDUSTRIAL:** ...
>
> **General Industry.** An area generally containing industrial, office, and service related activities of a larger scale and serving regional and national markets. In addition, amusements located in

planned zoning districts may be permitted.

According to Boulevard Del, this provision "continue[s] to prohibit generic commercial uses in the Industrial Designation." (Doc. 146 at 6). The Court disagrees. Unlike the neighborhood policy language previously found to preclude adult businesses, Policy 1.1.2 does not bar commercial uses in general or adult uses in particular. Clearly, the list of land uses enumerated in Policy 1.1.2 is not exclusive, and thus the fact that commercial or adult uses are not included in that list does not indicate that they are prohibited. Further, the fact that Policy 1.1.2 provides that "[o]ther uses may be approved by the City in such areas" undercuts Boulevard Del's assertion that allowing other uses in the Current M–5 District would conflict with the Comprehensive Plan.

Boulevard Del speculates that a court in the future might determine that allowing a particular adult use in an industrial area conflicts with the Comprehensive Plan, asserting that "generic commercial uses are simply inconsistent" with industrial uses and therefore must be prohibited in industrial areas. (Doc. 147 at 7–8). However, this Court's review of the pertinent Comprehensive Plan provisions reveals nothing to suggest that an adult use would be incompatible with or fail to further the "objectives, policies, land uses, and densities or intensities in the comprehensive plan." § 163.3194(3)(a), Fla. Stat. As such, operation of adult businesses within the Current M–5 District would not conflict with Policy 1.1.2.

### Subdivision and Infrastructure

Beyond pointing out the alleged Comprehensive Plan inconsistency, Boulevard Del argues that sites within the Current M–5 District are "unavailable" because of subdivision and infrastructure issues. As to infrastructure, the City contends, and Boulevard Del does not deny, that telephone and power lines extend through the interior of the Current M–5 District along the formerly unpaved portion of indian Lake Road. (Doc. 140 at 3). In addition, city water and sewer lines have been installed up to the boundary of the Current M–5 District. *Id.* Boulevard Del argues that this amount of infrastructure is too minimal to justify treating any sites within the Current M–5 District as "available" for First Amendment purposes.

As for the subdivision issue, the parties agree that a preliminary plat has been approved for the Current M–5 District that would create at least twenty-four one-acre lots with frontage on Indian Lake Road.[11] (Doc. 140 at 3). Additionally, as noted earlier, the City has advised the Court that on April 7, 2004, the City Commission adopted a resolution granting final plat approval and approving a standard contract for recording of the plat. (Doc. 172 at 1). The City states that it "cannot prepare and record the plat because it is not the owner of the land, but it has bound itself to sign the plat upon presentation of the documents." (Doc. 172 at 2).

Evaluating the availability of acreage in all stages of development including raw and, the Supreme Court held in *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), that land need not be commercially viable to be deemed available for adult use. There, the city ordinance had left 520 acres of land open for use by adult theaters. The *Renton* Court rejected the plaintiffs' arguments that the facts "that some of the land in question is already occupied by existing businesses, that 'prac-

---

**11.** Although it appears that the plat would result in several lots beyond these twenty-four, the record contains little information about these additional lots. Because of this, the Court will not consider them in connection with the instant motions.

tically none' of the undeveloped land is currently for sale or lease, and that in general there are no 'commercially viable' adult theater sites within the 520 acres" rendered the sites unavailable. 475 U.S. at 53, 106 S.Ct. 925. The Court explained:

> That respondents must fend for themselves in the real estate market, on an equal footing with other prospective purchasers and lessees, does not give rise to a First Amendment violation. And although we have cautioned against the enactment of zoning regulations that have "the effect of suppressing, or greatly restricting access to, lawful speech," we have never suggested that the First Amendment compels the Government to ensure that adult theaters, or any other kinds of speech-related businesses for that matter, will be able to obtain sites at bargain prices.

*Renton*, 475 U.S. at 54, 106 S.Ct. 925 (citation omitted).

The Eleventh Circuit addressed the availability of marginal land for adult businesses in *David Vincent*, wherein it surveyed the rules of other circuits and then set forth several more rules that guide the assessment of the instant case. The *David Vincent* court explained that the Ninth Circuit had "outlined five rules of thumb" regarding availability of land for adult uses: (1) there has to be "a genuine possibility that a site will become available for new commercial uses within a reasonable time"; (2) if a site is reasonably accessible to the public, that site is available; (3) a site "in a manufacturing zone with infrastructure such as roads, sidewalks, and lights" is available; (4) a site for relocation "must be appropriate for some commercial business" but "does not have to suit the particular needs of adult businesses"; and (5) "commercially zoned plots are considered available." *David Vincent*, 200 F.3d at 1334 (discussing *Topanga Press, Inc. v. City of Los Angeles*, 989 F.2d 1524, 1532–33 (9th Cir.1993)).

Additionally, in *David Vincent* the Eleventh Circuit noted that the Fifth Circuit has held that while physical barriers that cannot reasonably be overcome—such as the fact that land is under the ocean or not readily accessible to the public—preclude a finding of "availability," circumstances such as "an owner's unwillingness to rent or sell to an adult business" and land not being available for sale or lease are not relevant to the availability analysis. *David Vincent*, 200 F.3d at 1334 (discussing *Woodall v. City of El Paso*, 49 F.3d 1120, 1124 (5th Cir.1995)). Finally, the *David Vincent* court mentioned decisions of the Eighth and Fourth Circuits relating to the irrelevance of an owner's unwillingness to sale or lease cost-prohibitiveness, and commercial desirability of sites in an industrial area. *David Vincent*, 200 F.3d at 1334 (citing *Alexander v. City of Minneapolis*, 928 F.2d 278, 283 (8th Cir.1991), and *D.G. Rest. Corp. v. City of Myrtle Beach*, 953 F.2d 140, 147 (4th Cir.1991)).

After summarizing these cases from other circuits and noting that it had not yet addressed the proper approach to determining land availability in the adult-business context, the Eleventh Circuit declined "to formally adopt or critique the reasoning of *Woodall* or *Topanga*" and instead set forth "a few general rules":

> First, the economic feasibility of relocating to a site is not a First Amendment concern. Second, the fact that some development is required before a site can accommodate an adult business does not mean that the land is, *per se,* unavailable for First Amendment purposes. The ideal lot is often not to be found. Examples of impediments to the relocation of an adult business that may not be of a constitutional magnitude include having to build a new facility instead of moving into an existing building; having to clean up waste or landscape a site; bearing the costs of

generally applicable lighting, parking, or green space requirements; making due [sic] with less space than one desired; or having to purchase a larger lot than one needs. Third, the First Amendment is not concerned with restraints that are not imposed by the government itself or the physical characteristics of the sites designated for adult use by the zoning ordinance. It is of no import under *Renton* that the real estate market may be tight and sites currently unavailable for sale or lease, or that property owners may be reluctant to sell to an adult venue.

*David Vincent,* 200 F.3d at 1334–35. Thus, according to the Eleventh Circuit, a need for "some" development does not necessarily render the land unavailable as an alternative site for adult communication. Indeed, the *David Vincent* court upheld the district court's determination that "complications" as to the establishment of adult businesses on the land at issue there were not constitutionally troubling; those complications included that multiple plots would have to be purchased, that parcels would have to be redivided, that small lots would constrain some adult businesses' size, that one parcel had a "covenant against immoral uses," and that another site had potential hazardous waste contamination. 200 F.3d at 1329, 1335.

▪ In the instant case, nothing in the record indicates that the amount of development required to utilize the twenty-four lots—that is, extension of water and sewer lines from the edge of the district and of power and phone lines from the road fronting those sites—is sufficiently onerous to render the sites effectively "unavailable" under *David Vincent.* A preliminary plat has been approved, and on April 7, 2004 the Daytona Beach City Commission adopted a resolution granting final plat approval for the subdivision. (Doc. 172 at 1–2). The plat has not yet been recorded and steps remain to be taken by the devel-

oper of the sites, but the Court nevertheless concludes that the City should "get credit" for these twenty-four sites. Unlike the situation with respect to the Mason Avenue and Flag–Shaped Sites which have been determined to be "unavailable," subdivision within the Current M–5 District is far more than theoretical.

Although Boulevard Del maintains that even after final plat approval, additional steps remain before recording of the plat (and therefore actual subdivision) can occur, (Doc. 169 at 3), and that at most the Current M–5 District cannot be counted as providing more than three sites for adult expression, these remaining steps do not render the sites "unavailable" under the controlling case law discussed above. These steps include furnishing of a development bond, title opinion, and final drawings by the land owner, as well as approval of a "subdivision improvement agreement" and the final plat by the City. (*Id.* at 4). The Plaintiffs complain that the landowner seems unconcerned with pursuing development at this time and is unlikely to expend the sums required to record the plat "any time soon." (*Id.* at 6 n. 6).

However, even if valid, the concerns raised by Plaintiffs do not rise to constitutional dimensions. A cooperative landowner—i.e., a willing seller or landlord—has always been an implicit prerequisite to the operation of an adult business. The fact that a parcel of land has an owner who might not be willing to sell or lease it is not enough to render that parcel "unavailable" to adult businesses. Similarly, the fact that parcels might have an owner who might not be willing to *develop* the parcels so as to sell or lease them does not render them unavailable. As the Eleventh Circuit stated in *David Vincent,* "the First Amendment is not concerned with restraints that are not imposed by the gov-

ernment itself." [12] 200 F.3d at 1335. The Plaintiffs' arguments regarding the "dragging feet" of the owner of the twenty-four parcels thus are without merit. The steps remaining to be performed by the City before recordation do not appear to permit sufficient discretion as to allow unreasonable interference with the subdivision process if the landowner opts to continue moving the process forward. (*See* Doc. 169 at 4–5).

Thus, unlike many of the BA District sites discussed earlier, as to which no steps have been taken toward subdivision, the twenty-four sites within the Current M–5 District have been preliminarily platted and the plat has been finally approved. The City has not retained discretion to inhibit the recording of the plat, and the remaining steps depend on the landowner rather than the City. The Court considers the twenty-four one-acre parcels within the Current M–5 District available to adult businesses, and indeed would have considered them so even without the recent final plat approval by the City. When these sites are combined with the single Beville/Nova Site found to be available above, the Court finds that the City has made a total of twenty-five sites available to adult businesses. This is a constitutionally significant number given that only ten businesses are operating or seeking to operate in Daytona Beach and considering other relevant factors.

### C. Grandfathering and Secondary Effects

The parties have also addressed the "grandfathering" issue in their briefs. However, there is no evidence in the record that either Molly Brown's or The Pink Pony—as opposed to their sister establishments, which apparently feature fully nude dancing—ever operated as a "nonconforming use," a prerequisite for them to be grandfathered in at their current locations. *See, e.g., Fortunato v. City of Coral Gables,* 47 So.2d 321, 322 (Fla.1950) (stating that "zoning regulations do not generally operate to limit the right of a landowner to continue such uses of land and structures *as were in existence at the time of the adoption of the regulations,* on the theory that it would be an injustice and unreasonable hardship to compel the immediate removal or suppression of an *otherwise lawful business or use* already established") (emphasis added).

In addition, Boulevard Del's "secondary effects" argument is unpersuasive; the evidence considered by the City at the time it originally regulated adult businesses—i.e., the evidence discussed by Judge Sharp in the *Function Junction* opinion—justifies its efforts to regulate those businesses. Further, the zoning regulations primarily at issue in this case were intended to expand the area available to adult businesses rather than to restrict it. It makes no sense to require consideration of adverse secondary effects when the government is allowing *additional* adult expression.

### CONCLUSION

Given that, as noted above, a maximum of ten adult businesses are operating or seeking to operate in Daytona Beach, the Court finds that the City's provision of at least twenty-five potential sites for such businesses is sufficient to satisfy the requirements of the First Amendment. *See David Vincent,* 200 F.3d at 1336 (finding "the correlation of available sites to exist-

---

12. The situation would likely be different if the City had, for example, rezoned this particular district to M–5 solely because of knowledge that the landowner would never allow it to be developed or utilized by adult businesses. The record contains no suggestion that anything of that nature took place, however.

ing adult businesses important"); *cf. Fly Fish, Inc. v. City of Cocoa Beach*, 337 F.3d 1301, 1311 (11th Cir.2003) (declining to adopt bright-line rule but noting that "[i]n no case have we upheld a zoning ordinance that provides fewer locations than there are presently operating adult establishments"). This is particularly true given the limited demographic changes in Daytona Beach since the time of the *Function Junction* decision, which apparently found that *at most* eight sites [13] existed and that these eight sites provided adequate avenues for adult expression in the City. *See Function Junction, Inc. v. City of Daytona Beach*, 705 F.Supp. 544 (M.D.Fla.1987).

Accordingly, it is **ORDERED** and **ADJUDGED** as follows:

1. Defendant City of Daytona Beach's Motion for Final Summary Judgment (Zoning Claims) (Doc. 140) is **GRANTED**.

2. Plaintiff The Boulevard Del's Motion for Partial Summary Judgment (Doc. 46) is **DENIED**.

3. The Clerk is directed to enter judgment for Defendant City of Daytona Beach and thereafter to close the file in these consolidated cases.

---

13. As noted earlier, the *Function Junction* court heard testimony that eight adult businesses could operate simultaneously in the city but did not specifically determine that the city had provided that number of sites for adult expression.