[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 06-12022

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
June 28, 2007
THOMAS K. KAHN
CLERK

D. C. Docket No. 02-01469-CV-ORL-28-KRS

DAYTONA GRAND, INC.,
a Florida corporation doing
business as Lollipop's Gentlemen's Club,
MILES WEISS,

Plaintiffs-Appellants
Cross-Appellees,

versus

CITY OF DAYTONA BEACH, FLORIDA,
a municipal corporation,

Defendant-Appellee
Cross-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(June 28, 2007)**

Before HULL and MARCUS, Circuit Judges, and BARZILAY,* Judge.

---

*Honorable Judith M. Barzilay, Judge, United States Court of International Trade, sitting
by designation.

MARCUS, Circuit Judge:

At issue today is the constitutionality of several zoning and public nudity ordinances adopted by the City of Daytona Beach ("the City") to regulate adult theaters. The owners and operators of Lollipop's Gentlemen's Club ("Lollipop's"), an adult theater in Daytona Beach, sued the City claiming that these ordinances violate the First Amendment. The district court upheld the zoning ordinances, finding that the City had provided a constitutionally sufficient number of available sites for adult theaters, and also denied Lollipop's claim that it was "grandfathered in" under Florida law. However, the district court struck down the nudity ordinances, concluding that they did not further the substantial government interest in reducing negative secondary effects associated with adult theaters.

After thorough review, we affirm the district court's determination that the zoning ordinances pass constitutional muster, as well as its ruling that, under Florida law, Lollipop's is not entitled to grandfather status. But as for the nudity ordinances, we conclude that the City has indeed carried its evidentiary burden of establishing their constitutionality because the ordinances further substantial government interests, and, accordingly, we reverse and remand for further proceedings consistent with this opinion.

I.  Background

*A. Zoning Ordinances*

In 1981, after years of increasing urban blight and economic decline, the City of Daytona Beach adopted various zoning ordinances in an effort to reduce the perceived secondary effects of adult businesses by limiting the locations where they could open and operate.[1] Among other things, the zoning ordinances permitted adult theaters[2] to open only in the City's Business Automotive ("BA") zoning districts, and even there prohibited them from locating within certain distances of churches, schools, parks, playgrounds, or other adult businesses.[3]

---

[1] See Daytona Beach, Fla., Ordinance 81-292 (Sept. 16, 1981); see also Daytona Beach, Fla., Ordinance 82-67 (Feb 17, 1982) (amending the definition of "adult theater").

[2] The zoning ordinances define "adult theater," in relevant part, as "[a] use which exhibits any motion picture, exhibition, show, live show, representation, or other presentation which, in whole or in part, depicts nudity, sexual conduct, [or] sexual excitement." Daytona Beach, Fla., Ordinance 82-67 § 1 (Feb. 17, 1982), codified at Daytona Beach, Fla., Land Dev. Code art. II, § 3.1 (2001).

[3] Ordinance 81-292 added new provisions to and amended existing provisions of the City's zoning ordinances then in effect in order "[t]o reduce the adverse impacts of adult bookstores and adult theaters upon the City's neighborhoods." Ordinance 81-292 § 4. The Ordinance added definitions for "adult theater" and "adult bookstore," amended various provisions of the existing zoning ordinances for consistency, and, most importantly, added new sections to limit the locations where these adult businesses could open and operate. Those sections provided:

> 51.2.1 Adult bookstores and adult theaters shall be permitted as a matter of right in BA, BA-1, and BA-2 Districts. These adult uses shall not pyramid into or be allowed within the BW Districts.
>
> 51.2.2 It shall be unlawful to locate any adult theater and adult bookstore within 400 feet of any area of the City zoned R-1aa, R-1a, R-1a(1), R-1b, R-1c, R-2,

3

In the mid-1980s, the zoning ordinances were challenged on various grounds in Function Junction, Inc. v. City of Daytona Beach, 705 F. Supp. 544 (M.D. Fla. 1987), aff'd, 864 F.2d 792 (11th Cir. 1988) (table). Gerald Langston, the City's Director of Planning and Redevelopment and a key participant in formulating the zoning ordinances, testified in that case as an expert in urban planning and about the legislative process that led to their enactment. Langston said that, before enacting the zoning ordinances, the City had conducted a local study of urban blight and decay that identified two blighted areas: the old downtown and the beachside. Langston explained that the identification of these areas as blighted was based on characteristics such as: "a significant percentage of deteriorating structures; a large number of small . . . lots, which did not allow cars; a notable

R-2a, RA, R-2b, RP, R-3, PUD, T-1 or T-2.

51.2.3 It shall be unlawful to locate any adult bookstore and adult theater within 1,000 feet of any other such adult bookstores or adult theaters.

51.2.4 It shall be unlawful to locate any adult bookstore and adult theater within 400 feet of any church, school, public park or playground, or any other public or semi-public place or assembly where large numbers of minors regularly travel or congregate.

51.2.5 Distances in 51.2.3 and 51.2.4 shall be measured from property line to property line, without regard to the route of normal travel.

Ordinance 81-292 § 4. The Ordinance also limited adult businesses' use of outside advertising signs, prohibited them from painting their buildings in "garish colors," and required that all windows and doors be "blacked or otherwise obstructed" to block visibility of the inside from outside. Id.

parking problem; a high incidence of crime, particularly, on the beachside; and a large percentage of antiquated, underground utility systems, such as drainage, water and sewer systems." Id. at 547. Langston testified that the blight deterred investment -- hotel development ceased in 1975, and in the late 1970's, Daytona Beach was denominated the "City of Sleaze." Id.

Langston explained that the City of Daytona Beach then created a Redevelopment Design and Review Board to deal with the blight problem. Id. Langston worked with the Board and testified that it "considered studies of blight in Boston and Detroit by the American Society of Planning Officials in 1979-1980. These studies show strong evidence that the central location of adult uses, like the 'Combat Zone' in Boston, causes the blighted area to grow and creates blight in fringe areas." Id. Langston also opined, "[b]ased upon his education, experience, knowledge of blight in Daytona Beach and his participation in drafting the subject ordinance," that live nude and seminude entertainment businesses "promote and perpetuate urban decay" and that "adult businesses have impacted on crime in the area surrounding Daytona Beach." Id.

David Smith, an assistant state attorney who had prosecuted drug and prostitution offenses in Daytona Beach, also testified that "'most definitely' there were more drug and prostitution offenses in topless bars than in other bars." Id. at

5

548. Based in part on this testimony by Langston and Smith, the district court in Function Junction upheld the zoning ordinances. Id. at 552.

In 1993, the City enacted several amendments to the zoning ordinances that, among other things, required adult theaters to obtain pre-approval from a Technical Review Committee before being able to open and operate in the BA districts. In a First Amendment challenge brought by several adult theaters, the United States District Court for the Middle District of Florida entered a preliminary injunction preventing the City from enforcing the 1993 amendments because, the court found, the plaintiffs were likely to prevail at trial on their claims. Red-Eyed Jack, Inc. v. City of Daytona Beach, 165 F. Supp. 2d 1322, 1330 (M.D. Fla. 2001) [hereinafter Red-Eyed Jack I].

While the Red-Eyed Jack litigation was still pending, the City amended its zoning ordinances still again to eliminate the constitutional infirmities identified by the district court.[4] Relevant here, the City once again allowed adult theaters to open

---

[4] Daytona Beach, Fla., Ordinance 01-367 § 1 (Sept. 5, 2001). Ordinance 01-367 enacted the substantive provisions that are currently in force in the BA districts:

Adult bookstores and adult theaters are permitted as of right in BA districts. The purpose of the conditions is to reduce the adverse impacts of adult bookstores and adult theaters upon neighborhoods by avoiding the concentration of uses which cause or intensify physical and social blight; improving visual appearance of adult uses; reducing negative impacts of adult uses upon other business uses, neighborhood property values, residential areas, and public and semi-public uses; insuring that adult uses do not impede redevelopment and neighborhood revitalization efforts; and avoiding adult uses in heavily used pedestrian areas. The following conditions must be met:

in the BA districts without pre-approval.[5] The City also created a new zoning

district category, the M-5 Heavy Industrial Zoning District ("M-5"),[6] and

ultimately applied it to 210 acres in the western part of the City.[7] Within this new

(a) It shall be unlawful to locate any adult bookstore or adult theater within 400 feet of any residential, R-PUD, T-1, or T-2 district.

(b) It shall be unlawful to locate any adult bookstore or adult theater within 1,000 feet of any other adult theater or adult bookstore.

(c) It shall be unlawful to locate any adult bookstore or adult theater within 400 feet of any church, school, public park, or playground, or any other public or semi-public place of assembly where large numbers of minors regularly travel or congregate.

(d) Distances shall be measured from property line to property line, without regard to the route of normal travel.

(e) Outside advertising shall be limited to one identification sign, not to exceed 20 square feet. Advertisements, displays, or other promotional materials shall not be shown or exhibited to be visible to the public from a pedestrian sidewalk or walkway or from other public or semi-public areas; and such displays shall be considered signs.

(f) Buildings shall not be painted in garish colors or such other fashion as will effectuate the same purpose as a sign. All windows, doors, and other apertures shall be blacked or otherwise obstructed so as to prevent viewing of the interior of the establishment from without.

Daytona Beach, Fla., Land Dev. Code art. XI, § 3.2 (2001).

[5] The distance requirements between adult theaters and churches, schools, parks, playgrounds, and other adult businesses remain in effect.

[6] Daytona Beach, Fla., Ordinances 01-456 & 01-457 (Oct. 17, 2001).

[7] Initially, the City zoned twenty acres as M-5, but after the district court entered still another injunction based on its finding that the City still did not provide a sufficient number of sites where adult theaters could open and operate, the City zoned as M-5 an additional 190 acres adjacent to the original twenty acres. Daytona Beach, Fla., Ordinance 03-195 (May 7, 2003); see also Red-Eyed Jack, Inc. v. City of Daytona Beach, 322 F. Supp. 2d 1361, 1364-65 (M.D. Fla.

M-5 district, adult theaters were permitted to open without the distance requirements that applied in BA districts. Although the M-5 district consisted mostly of undeveloped land, the City ensured that telephone and power lines were installed in the district's interior, the county paved a previously dirt road through it, and the City approved a preliminary plat for a fifty-five-acre subdivision straddling that road.[8] As a result of these changes, the district court concluded that the zoning ordinances were constitutional. Red-Eyed Jack, Inc. v. City of Daytona Beach, 322 F. Supp. 2d 1361, 1362 (M.D. Fla. 2004) [hereinafter Red-Eyed Jack II]. The court found that twenty-four new sites were available in the M-5 district and that, in concert with one site already found to be available in the BA district, this created a constitutionally sufficient number of sites for the ten adult businesses that were operating or seeking to operate in Daytona Beach at that time. Id. at 1375.

*B. Nudity Ordinances*

In conjunction with the zoning ordinances adopted in 1981, the City enacted Ordinance 81-334 to prohibit nudity and sexual conduct in establishments that serve alcohol.[9] Specifically, in any establishment that deals in alcoholic beverages,

---

2004).

[8] Daytona Beach, Fla., Ordinance 03-196 (May 7, 2003).

[9] In relevant part, Ordinance 81-334 provides:

(a) No person shall expose to public view such person's genitals, pubic area,

vulva, anus, anal cleft or cleavage or buttocks or any simulation thereof in an establishment dealing in alcoholic beverages.

(b) No female person shall expose to public view any portion of her breasts below the top of the areola or any simulation thereof in an establishment dealing in alcoholic beverages.

(c) No person maintaining, owning, or operating an establishment dealing in alcoholic beverages shall suffer or permit any person to expose to public view such person's genitals, pubic area, vulva, anus, anal cleft or cleavage or buttocks or simulation thereof within the establishment dealing in alcoholic beverages.

(d) No person maintaining, owning, or operating an establishment dealing in alcoholic beverages shall suffer or permit any female person to expose to public view any portion of her breasts below the top of the areola or any simulation thereof within the establishment dealing in alcoholic beverages.

(e) No person shall engage in and no person maintaining, owning, or operating an establishment dealing in alcoholic beverages shall suffer or permit any sexual intercourse; masturbation; sodomy; bestiality; oral copulation; flagellation; sexual act which is prohibited by law; touching, caressing or fondling of the breasts, buttocks, anus or genitals; or the simulation thereof within an establishment dealing in alcoholic beverages.

(f) No person shall cause and no person maintaining, owning or operating an establishment dealing in alcoholic beverages shall suffer or permit the exposition of any graphic representation, including pictures or the projection of film, which depicts human genitals; pubic area; vulva; anus; anal cleft or cleavage; buttocks; female breasts below the top of the areola; sexual intercourse; masturbation; sodomy; bestiality; oral copulation; flagellation; sexual act prohibited by law; touching, caressing or fondling of the breasts, buttocks, anus, or genitals; or any simulation thereof within any establishment dealing in alcoholic beverages.

Daytona Beach, Fla., Ordinance 81-334 § 1 (Oct. 21, 1981), codified at Daytona Beach, Fla., Code § 10-6 (2001). Section 2 of Ordinance 81-334, although not codified in the City's Code of Ordinances, provides the City's rationale for Ordinance 81-334's enactment:

It is hereby found that the acts prohibited in Section 1 above encourage the conduct of prostitution, attempted rape, rape, murder, and assaults on police officers in and around establishments dealing in alcoholic beverages, that actual and simulated nudity and sexual conduct and the depiction thereof coupled with alcohol in public places begets undesirable behavior, that sexual, lewd, lascivious, and salacious conduct among patrons and employees within

Ordinance 81-334 prohibits: the "expos[ure] to public view [of a] person's genitals, pubic area, vulva, anus, anal cleft or cleavage or buttocks"; the "expos[ure] to public view [of] any portion of [a woman's] breasts below the top of the areola"; a wide variety of sexual activities; and any "simulation" or "graphic representation, including pictures or the projection of film, which depicts" any of the conduct prohibited by the Ordinance. In addition, Ordinance 81-334 provides that no person "maintaining, owning, or operating an establishment dealing in alcoholic beverages shall suffer or permit" any of the proscribed conduct.

By 2001, the City of Daytona Beach became concerned that some bars were exploiting a loophole in Ordinance 81-334 by separating alcohol and nudity within a single structure but allowing for ready access between the two areas. The City also became increasingly concerned that lewd and lascivious conduct within adult theaters was increasing and that nudity in streets, parks, and other public places was especially a problem during events such as Spring Break and Black College Reunion.

Motivated by these perceived concerns, the City enacted Ordinance 02-496

---

establishments dealing in alcoholic beverages results in violation of law and dangers to the health, safety and welfare of the public, and it is the intent of this ordinance to prohibit nudity, gross sexuality, and the simulation and depiction thereof in establishments dealing in alcoholic beverages.

Id. § 2.

to reduce "lewd and lascivious behavior, prostitution, sexual assaults and batteries, . . . other criminal activity, . . . [the] degradation of women, and . . . activities which break down family structures and values."[10] In fact, Ordinance 02-496 was enacted as a general public nudity ordinance and prohibited any person over ten years of age from "recklessly, knowingly, or intentionally" appearing in any public place with "anything other than a full and opaque covering" over the following areas: "[t]he male or female genitals, pubic area, or anal cleavage"; "[t]he nipple and areola of the female breast"; "at least one-half of that outside surface area of the breast located below the top of the areola, which area shall be reasonably compact and contiguous to the areola"; "[o]ne-third of the male or female buttocks centered over the cleavage of the buttocks for the length of the cleavage"; and, even if covered, the "male genitals in a discernibly turgid state."[11] Ordinance 02-496 also provided a non-exhaustive list of items of clothing that are *not* sufficient to comply with its provisions: "items commonly known as G-strings, T-backs, dental floss, and thongs."[12]

---

[10] Daytona Beach, Fla., Ordinance 02-496 § 5 (Oct. 2, 2002).

[11] Daytona Beach, Fla., Code § 62-183(a), (b), enacted by Ordinance 02-496 § 14.

[12] Daytona Beach, Fla., Code § 62-183(c), enacted by Ordinance 02-496 § 14. Ordinance 02-496 added Article VI, "Public Nudity," to Chapter 62 of the City's Code of Ordinances. Article VI first states the City's purpose for adding a public nudity prohibition to the City's Code of Ordinances:

(a) It is the intent of this article to protect and preserve the health, safety and welfare of the people of The City of Daytona Beach by prohibiting any person from recklessly, knowingly, or intentionally appearing nude in a public place, or recklessly, knowingly, or intentionally causing or permitting another person to appear nude in a public place within the City, subject to the exceptions provided in § 62-[184].

(b) The City Commission has further expressed its intent and findings in Ordinance 02-496, adopting this article.

Daytona Beach Code § 62-181. After defining the terms "breast," "buttocks," "public place provided or set apart for nudity," and "public place," see id. § 62-182, Article VI then lists the following substantive prohibitions:

(a) It shall be unlawful for any person ten years of age or older to recklessly, knowingly, or intentionally appear in a public place, or to recklessly, knowingly, or intentionally cause or permit another person ten years of age or older to appear in a public place in a state of dress or undress such that any of the following body parts or portions thereof are exposed to view or are covered with anything other than a full and opaque covering which completely covers all of the described area:

(1) The male or female genitals, pubic area, or anal cleavage.

(2) The nipple and areola of the female breast; and in addition at least one-half of that outside surface area of the breast located below the top of the areola, which area shall be reasonably compact and contiguous to the areola.

(3) One third of the male or female buttocks centered over the cleavage of the buttocks for the length of the cleavage. This area is more particularly described as that portion of the buttocks which lies between the top and bottom of the buttocks, and between two imaginary straight lines, one on each side of the anus and each line being located one-third of the distance from the anus to the outside perpendicular line defining the buttocks, and each line being perpendicular to the ground and to the horizontal lines defining the buttocks.

(b) It shall be unlawful for any person to recklessly, knowingly, or intentionally appear in a public place, or to recklessly, knowingly, or intentionally cause or permit another person to appear in a public place in a manner as to show or display the covered male genitals in a discernibly turgid state.

(c) Attire which is insufficient to comply with these requirements includes but is not limited to those items commonly known as G-strings, T-backs, dental floss, and thongs.

(d) Body paint, body dye, tattoos, latex, tape, or any similar substance applied to the skin

12

In July 2003, less than a year after the City enacted Ordinance 02-496, a panel of this Court decided Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County, 337 F.3d 1251 (11th Cir. 2003). That decision suggested that an ordinance that does not leave an erotic dancer "free to perform wearing pasties and G-strings" would violate the First Amendment because it would significantly affect the dancer's "capacity to convey [an] erotic message." Id. at 1274 (quotation marks

---

surface, any substance that can be washed off the skin, or any substance designed to simulate or which by its nature simulates the appearance of the anatomical area beneath it, is not full and opaque covering as required by this section.

Id. § 62-183. Article VI then provides that "[t]he offense of public nudity or exposure as set forth in section 62-183 shall not occur in any of the following instances:"

(1) When a person appears nude in a public place provided or set apart for nudity, and such person is nude for the sole purpose of performing a legal function that is customarily intended to be performed within such public place, and such person is not nude for the purpose of obtaining money or other financial gain for such person or for another person or entity; or

(2) When the conduct of being nude cannot constitutionally be prohibited by this section because it constitutes a part of a bona fide live communication, demonstration, or performance by such person wherein such nudity is expressive conduct incidental to and necessary for the conveyance or communication of a genuine message or public expression, and is not a guise or pretense utilized to exploit nudity for profit or commercial gain; or

(3) When the conduct of being nude cannot constitutionally be prohibited by this section because it is otherwise protected by the United States Constitution or the Florida Constitution.

Id. § 62-184(a) (citations omitted).

13

omitted). About five weeks later, the City enacted Ordinance 03-375, which amended Ordinance 02-496 to allow erotic dancers to wear G-strings and pasties "within a fully enclosed structure legally established as an adult theater" that is more than 500 feet from an establishment that serves alcohol.[13] Within 500 feet of an alcohol-serving establishment, however, Ordinance 02-496 applies and, as described above, requires clothing somewhat more modest than G-strings and pasties.[14]

---

[13] Daytona Beach, Fla., Ordinance 03-375 § 9 (Aug. 20, 2003), codified at Daytona Beach, Fla., Code § 62-184(b). Ordinance 03-375 added the following exception to the City's Code of Ordinances:

> (1) In the course of the presentation of erotic dance or other artistic expression which is entitled to first amendment protection within a fully enclosed structure legally established as an adult theater as defined in the Land Development Code:
>
> > a. The breast covering required by subsection 62-183(a)(2) shall not be required, except that nipples and areolae shall be covered.
> >
> > b. The buttocks covering required by subsection 62-183(a)(3) shall not be required, and subsection 62-183(c) shall not apply.

Daytona Beach Code § 62-184(b)(1), enacted by Ordinance 03-375 § 9.

[14] Specifically, the more modest clothing requirements apply to an adult theater that:

> a. is located in the same structure as an establishment dealing in alcoholic beverages . . . unless the closest point of the premises of the alcoholic beverage establishment is more than 500 feet from the boundary line of the adult theater use; or
>
> b. is located under the same roof as an establishment dealing in alcoholic beverages . . . unless the closest point of the premises of the alcoholic beverage establishment is more than 500 feet from the boundary line of the adult theater use; or

14

*C. Lollipop's Lawsuit*

On December 10, 2003, Lollipop's brought this suit challenging the constitutionality of the zoning ordinances and of Ordinances 81-334, 02-496, and 03-375. First, Lollipop's claimed that the zoning ordinances do not offer reasonable alternative venues for adult theaters to communicate their erotic message because an insufficient number of sites are available for adult theaters. Alternatively, Lollipop's claimed that it was "grandfathered in" as a lawful nonconforming use under Florida law. The district judge, who also presided over the Red-Eyed Jack litigation, granted summary judgment to the City of Daytona Beach on both claims, noting that the City had made no changes to the zoning

> c. shares any wall, floor, or ceiling with an establishment dealing in alcoholic beverages . . .; or
>
> d. shares an entry area with an establishment dealing in alcoholic beverages . . .; or
>
> e. provides for or permits the interior passage of customers directly or indirectly between it and an establishment dealing in alcoholic beverages . . ., whether or not a separate cover or admission fee is charged; or
>
> f. is located adjacent or next door to an establishment dealing in alcoholic beverages . . .; or
>
> g. is located within 500 feet of an establishment dealing in alcoholic beverages . . ., measured from property line of one use to property line of the other use, including parking areas and other appurtenances associated with each use; or
>
> h. is not legally authorized to operate as an adult theater.

Daytona Beach Code § 62-184(b)(2), enacted by Ordinance 03-375 § 9.

ordinances since his decision in <u>Red-Eyed Jack II</u> and that Lollipop's provided no evidence that warranted a departure from the earlier decision.

Second, Lollipop's challenged Ordinances 81-334, 02-496, and 03-375, urging that they neither further a substantial government interest nor are narrowly tailored. The district court granted final summary judgment to the City on Lollipop's narrow tailoring claim, but concluded that there was a genuine issue of material fact about whether the three nudity ordinances furthered a substantial government interest. Thereafter, at a six-day bench trial, Lollipop's presented expert testimony in an effort to cast direct doubt on the City's rationale for enacting the nudity ordinances. The experts explained at trial that they had conducted two empirical studies using data provided by the City. They concluded based on the data they examined that adult theaters in Daytona Beach had no statistically significant effect on crime rates, and that the City's evidence offered to the contrary was "shoddy" and "meaningless."

The district court agreed and concluded that Lollipop's evidence cast direct doubt on the City's rationale for enacting the nudity ordinances:

> Plaintiffs have succeeded in their attempt to cast direct doubt on the City's rationales for its ordinances. As persuasively demonstrated by Plaintiffs' expert studies, the City's pre-enactment evidence consists either of purely anecdotal evidence or opinions based on highly unreliable data. Most notably, the City's evidence lacks data which would allow for a comparison of the rate of crime occurring in and

16

around adult entertainment establishments with the rate of crime occurring in and around similarly situated establishments. Absent the context that such a comparison might provide, the City's data is, as Plaintiffs assert, "meaningless."

The court also determined that the additional evidence provided by the City in an effort to renew support for the ordinances was similarly flawed. The district court, therefore, held that Ordinances 81-334, 02-496, and 03-375 did not further a substantial government interest and declared that they violated the First Amendment. In fact, the district court struck all three nudity ordinances in their entirety, except for subsection 10-6(e) of the Daytona Beach Code (enacted by Ordinance 81-334) because that subsection regulates non-expressive conduct.

These appeals followed: Lollipop's argued that the district court had improvidently entered summary judgment for the City on its challenge to the zoning ordinances, as well as on its claim to grandfather status. The City, in turn, cross-appealed the court's determination that the three nudity ordinances were unconstitutional. Lollipop's also appealed from the grant of final summary judgment to the City on its claim that the nudity ordinances are not narrowly tailored.[15]

_____

[15] Lollipop's also claimed in the district court that it is exempt from Ordinance 02-496 by its own terms, but the district court had no occasion to rule on this claim because it declared Ordinance 02-496 unconstitutional. Because Lollipop's does not raise this argument on appeal, the claim is deemed abandoned. See Access Now, Inc. v. Southwest Airlines Co., 385 F.3d 1324, 1330 (11th Cir. 2004).

17

## II. Zoning Ordinances

The City's zoning ordinances do not ban adult theaters altogether but do restrict them to the BA and M-5 zoning districts and, in the BA districts, impose distance requirements between adult theaters and churches, schools, parks, playgrounds, and other adult businesses.[16] We review the constitutionality of a city ordinance de novo. See Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County, 337 F.3d 1251, 1255 (11th Cir. 2003).

It is by now well-established that zoning ordinances limiting the locations where adult businesses may be located are evaluated under the three-part test for time, place, and manner regulations established in City of Renton v. Playtime Theatres, Inc., 475 U.S. 41 (1986), and reaffirmed in City of Los Angeles v. Alameda Books, Inc., 535 U.S. 425 (2002). Peek-A-Boo Lounge, 337 F.3d at 1264; see also David Vincent, Inc. v. Broward County, 200 F.3d 1325, 1333 (11th Cir. 2000). We have summarized the Renton framework this way:

> first, the court must determine whether the ordinance constitutes an invalid total ban or merely a time, place, and manner regulation; second, if the ordinance is determined to be a time, place, and manner regulation, the court must decide whether the ordinance should be

---

[16] In BA districts, an adult theater must be located at least 400 feet from "any residential, R-PUD, T-1, or T-2 district," 400 feet from any church, school, park, playground, or "any other public or semi-public place of assembly where large numbers of minors regularly travel or congregate," and 1000 feet from other adult businesses. Daytona Beach, Fla., Land Dev. Code art. XI, § 3.2 (2001).

18

subject to strict or intermediate scrutiny; and third, if the ordinance is held to be subject to intermediate scrutiny, the court must determine whether it is designed to serve a substantial government interest and allows for reasonable alternative channels of communication.

Peek-A-Boo Lounge, 337 F.3d at 1264; see also Renton, 475 U.S. at 46-50. Because neither party disputes that the first two prongs have been satisfied or that the zoning ordinances serve a substantial government interest, our analysis under Renton focuses solely on whether the zoning ordinances provide adult theaters with reasonable alternative channels of communication. We hold that they do.

A new zoning regime must leave adult businesses with a "reasonable opportunity to relocate," and "the number of sites available for adult businesses under the new zoning regime must be greater than or equal to the number of adult businesses in existence at the time the new zoning regime takes effect." Fly Fish, Inc. v. City of Cocoa Beach, 337 F.3d 1301, 1310-11 (11th Cir. 2003) (quoting David Vincent, 200 F.3d at 1337 n.17). Although a district court's calculation of the number of sites that a zoning ordinance makes available for adult businesses is a factual finding that we review only for clear error, the district court's methodology in making that calculation -- such as whether a particular site is "available" and provides a reasonable avenue for communicating an adult business's erotic message -- is a legal determination that we review de novo. David Vincent, 200 F.3d at 1333; see also Fly Fish, 337 F.3d at 1309.

19

We have enumerated several "general rules" to aid in deciding whether a particular site is available for First Amendment purposes:

> First, the economic feasibility of relocating to a site is not a First Amendment concern. Second, the fact that some development is required before a site can accommodate an adult business does not mean that the land is, per se, unavailable for First Amendment purposes. The ideal lot is often not to be found. Examples of impediments to the relocation of an adult business that may not be of a constitutional magnitude include having to build a new facility instead of moving into an existing building; having to clean up waste or landscape a site; bearing the costs of generally applicable lighting, parking, or green space requirements; making [do] with less space than one desired; or having to purchase a larger lot than one needs. Third, the First Amendment is not concerned with restraints that are not imposed by the government itself or the physical characteristics of the sites designated for adult use by the zoning ordinance. It is of no import under Renton that the real estate market may be tight and sites currently unavailable for sale or lease, or that property owners may be reluctant to sell to an adult venue.

David Vincent, 200 F.3d at 1334-35. As the Supreme Court explained in Renton, simply because adult businesses "must fend for themselves in the real estate market, on an equal footing with other prospective purchasers and lessees, does not give rise to a First Amendment violation." 475 U.S. at 54.

Here, the district court relied on its earlier finding in Red-Eyed Jack II that twenty-five sites -- twenty-four in the M-5 district and one in the BA district -- are available for adult theaters. 322 F. Supp. 2d at 1372-75. Because the Red-Eyed Jack II court found that, at most, ten adult theaters were operating or seeking to

20

operate in the City of Daytona Beach, id. at 1367, it held that the zoning ordinances provide for a constitutionally sufficient number of sites, id. at 1375. In the instant case, the district court concluded that Lollipop's had presented no evidence to warrant a departure from its earlier ruling in Red-Eyed Jack II.

Lollipop's vigorously disagrees, contending that the M-5 district is no more than "unimproved industrial property" and that, therefore, the twenty-four lots in the M-5 district cannot count as being "available" under Renton. The undisputed historical facts concerning the M-5 district are these: (1) telephone and power lines extend through the interior of the M-5 district along a now-paved road; (2) water and sewer lines have been installed up to the boundary of the M-5 district; (3) a preliminary plat has been approved for fifty-five acres of the M-5 district that would create at least twenty-four one-acre sites fronting the now-paved road; and (4) the entire M-5 district is owned by a single private landowner, not by the City. Id. at 1372, 1374.

Under the applicable case law, these undisputed facts yield the conclusion that the twenty-four sites in the M-5 district are available for First Amendment purposes. It is irrelevant for our purposes that all of the land in the M-5 district is owned by a single private landowner who may be reluctant or unwilling to develop or sell the land. See David Vincent, 200 F.3d at 1335 (holding that "[i]t is of no

import under <u>Renton</u> that the real estate market may be tight and sites currently unavailable for sale or lease, or that property owners may be reluctant to sell to an adult venue," and finding sites available even though there was "no evidence that any of the land is for sale"). Nor is it constitutionally significant that the land is mostly vacant where, as here, the City has provided sufficient infrastructure for a private developer to commence development, including a paved road, telephone and power lines, and water and sewer lines. <u>See</u> <u>id.</u> at 1334 ("Examples of impediments to the relocation of an adult business that may not be of a constitutional magnitude include having to build a new facility instead of moving into an existing building . . . .").

Although we have acknowledged that "the physical characteristics of a site or the character of current development could render relocation by an adult business unreasonable," examples of such unavailable sites are "land under the ocean, airstrips of international airports, and sports stadiums." <u>Id.</u> at 1335. Here, the land in the M-5 district is hardly comparable to such sites, where relocation is, for all practical purposes, untenable. Finally, the City has removed the legal obstacles that might have prevented adult theaters from relocating to the M-5 district, and has gone so far as to approve a preliminary plat for a fifty-five-acre subdivision straddling the main road in the M-5 district. <u>Cf.</u> <u>id.</u> at 1335 ("[T]he

22

First Amendment is not concerned with restraints that are not imposed by the government itself . . . ."). In short, we agree with the district court that the twenty-four sites in the M-5 district are available under Renton. And because the record shows that no more than ten adult theaters are operating or seeking to operate in Daytona Beach, the zoning ordinances are constitutional; reasonable alternative channels of communication are available.

Lollipop's also claims that, even if the zoning ordinances are constitutional, Lollipop's is otherwise "grandfathered in" under Florida law.[17] Lollipop's argument is grounded on the contention that the zoning ordinances were unconstitutional at the time that Lollipop's began operating as an adult theater. Although the City may now have cured the earlier constitutional defects, Lollipop's argues that no valid law made Lollipop's unlawful when it opened. Thus, according to Lollipop's, its right to operate at its current location "vested" at that time, and it may continue to operate there despite any subsequent changes to the zoning ordinances that rendered it a nonconforming use.[18] The district court

---

[17] The Constitution does not require a "grandfathering" provision for existing nonconforming adult businesses, David Vincent, 200 F.3d at 1332, and any vested right to continue operating as a lawful nonconforming use derives from state law, see Coral Springs St. Sys., Inc. v. City of Sunrise, 371 F.3d 1320, 1333 (11th Cir. 2004).

[18] Lollipop's is located at 639 Grandview Avenue in Daytona Beach, Florida, and has been operating as an adult theater there since October 2000. Although the City disputes when Lollipop's began operating as an adult theater, Lollipop's claim to grandfather status was decided in the district court on the City's motion for summary judgment, and therefore we

granted summary judgment to the City on this claim too, and we review the district court's determination <u>de novo</u>. <u>See</u> <u>Reserve, Ltd. v. Town of Longboat Key</u>, 17 F.3d 1374, 1377 (11th Cir. 1994).

"Not surprisingly, vested rights are not created easily" under Florida law. <u>Coral Springs St. Sys., Inc. v. City of Sunrise</u>, 371 F.3d 1320, 1333 (11th Cir. 2004). "The overarching pattern in Florida's case law is that vested rights can be created . . . only in two circumstances." <u>Id.</u> at 1334. The first occurs "when a party has reasonably and detrimentally relied on existing law, creating the conditions of equitable estoppel," while the second occurs "when the defendant municipality has acted in a clear display of bad faith." <u>Id.</u> Here, neither circumstance applies. It is undisputed that when Lollipop's began operating as an adult theater, it violated the zoning ordinances as then written. As a matter of logic, then, Lollipop's cannot have relied on existing law because it began operating plainly in contravention of that law. Nor is there any record evidence of bad faith or arbitrary behavior by the City. Therefore, on this record, the district court correctly concluded that Lollipop's has failed to establish a vested right to continue operating as a lawful nonconforming use.

---

construe the record in the light most favorable to Lollipop's.

24

### III.  Nudity Ordinances

We analyze the three nudity ordinances challenged here under the four-part

test for expressive conduct set forth by the Supreme Court in United States v.

O'Brien, 391 U.S. 367 (1968), and employed in City of Erie v. Pap's A.M., 529

U.S. 277 (2000). As we have explained:

> According to this test, public nudity ordinances that incidentally
> impact protected expression should be upheld if they (1) are within
> the constitutional power of the government to enact; (2) further a
> substantial governmental interest; (3) are unrelated to the suppression
> of free expression; and (4) restrict First Amendment freedoms no
> greater than necessary to further the government's interest.

Peek-a-Boo Lounge, 337 F.3d at 1264. Here, our analysis focuses on the second

and fourth prongs because there is no dispute between the parties as to the first and

third prongs.

*A. Substantial Government Interest*

Under O'Brien's second prong, a city must establish that the challenged

ordinance furthers a substantial government interest. Pap's A.M., 529 U.S. at 296

(plurality opinion).[19] It has been by now clearly established that reducing the

---

[19] In Pap's A.M., like some of the Supreme Court's other decisions in this area, there was no majority opinion on the First Amendment issue before the Court. Justice O'Connor wrote a plurality opinion, joined by Chief Justice Rehnquist and Justices Kennedy and Breyer, which upheld under O'Brien the constitutionality of the nudity ordinance at issue. Pap's A.M., 529 U.S. at 289-302 (plurality opinion). Relevant here, the plurality concluded that O'Brien's second prong was satisfied because "[t]he asserted interests of regulating conduct through a public nudity ban and of combating the harmful secondary effects associated with nude dancing are undeniably important," and because the evidence that the city produced established that "it was

secondary effects associated with adult businesses is a substantial government

interest "that must be accorded high respect." City of L.A. v. Alameda Books, Inc.,

535 U.S. 425, 444 (2002) (Kennedy, J., concurring in the judgment) (quotation

---

reasonable for [the city] to conclude that . . . nude dancing was likely to produce the[se] secondary effects." Id. at 296-97. Justice Scalia wrote a separate opinion, joined by Justice Thomas, concurring in the judgment. They agreed that the ordinance should be upheld, "not because it survives some lower level of First Amendment scrutiny [i.e., O'Brien], but because, as a general law regulating conduct and not specifically directed at expression, it is not subject to First Amendment scrutiny at all." Id. at 307-08 (Scalia, J., concurring in the judgment) (quotation marks omitted). Justice Souter concurred in part and dissented in part. He agreed with the plurality that the nudity ordinance at issue should be analyzed under O'Brien. Id. at 310 (Souter, J., concurring in part and dissenting in part). But he dissented from the judgment because, unlike the plurality, he concluded that the city failed to carry its evidentiary burden to show that its ordinance furthered a substantial government interest. Id. at 313-17. Justice Stevens also wrote a dissenting opinion, joined by Justice Ginsburg.

For our purposes, a majority of the Court -- the four-Justice plurality along with Justice Souter -- held that nudity ordinances that are designed to combat the secondary effects associated with nude dancing are analyzed under the O'Brien framework. See id. at 289-91 (plurality opinion); id. at 310 (Souter, J., concurring in part and dissenting in part). As for the Court's judgment that the ordinance at issue was constitutional -- supported by the plurality and by Justices Scalia and Thomas's concurrence in the judgment -- no rationale explaining that result gained the support of a majority of the Court. "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." Marks v. United States, 430 U.S. 188, 193 (1977) (quotation marks omitted). In Pap's A.M., the plurality upheld the ordinance on the rationale that it survived First Amendment scrutiny under the O'Brien framework, and although the votes of Justices Scalia and Thomas were necessary for the judgment, their grounds for concurring in the judgment were far broader than the plurality's, namely, that the First Amendment did not apply "at all." See Pap's A.M., 529 U.S. at 307-08 (Scalia, J., concurring in the judgment). As such, the plurality's holding with respect to the application of O'Brien is the narrowest ground supporting the judgment in Pap's A.M. and, therefore, represents the holding of that case under Marks. Peek-A-Boo Lounge, 337 F.3d at 1261-62; accord Heideman v. S. Salt Lake City, 348 F.3d 1182, 1198 (10th Cir. 2003); SOB, Inc. v. County of Benton, 317 F.3d 856, 862 n.1 (8th Cir. 2003); Ben's Bar, Inc. v. Village of Somerset, 316 F.3d 702, 719 (7th Cir. 2003).

marks omitted);[20] see also Pap's A.M., 529 U.S. at 296 (plurality opinion) ("[C]ombating the harmful secondary effects associated with nude dancing [is] undeniably important."); Ctr. for Fair Pub. Policy v. Maricopa County, 336 F.3d 1153, 1166 (9th Cir. 2003) ("It is beyond peradventure at this point in the development of the doctrine that a state's interest in curbing the secondary effects associated with adult entertainment establishments is substantial.").

As for whether an ordinance "furthers" this interest, a city bears the initial burden of producing evidence that it relied upon to reach the conclusion that the ordinance furthers the city's interest in reducing secondary effects. Peek-A-Boo

---

[20] Alameda Books addressed the constitutionality of a zoning ordinance under the Renton framework, rather than a public nudity ordinance under the O'Brien framework. We have explained, however, that the third step of the Renton analysis, which asks whether an ordinance "is designed to serve" a substantial government interest, is "virtually indistinguishable" from the second prong of the O'Brien test, which asks whether an ordinance "furthers" a substantial government interest. Peek-A-Boo Lounge, 337 F.3d at 1264-65. Therefore, although we are addressing the constitutionality of the City's nudity ordinances under O'Brien, our analysis also relies on cases that addressed the constitutionality of zoning ordinances under Renton.

There was no majority opinion in Alameda Books. Justice O'Connor wrote a plurality opinion, joined by Chief Justice Rehnquist and Justices Scalia and Thomas, that applied Renton and concluded that the zoning ordinance at issue was constitutional. Alameda Books, 535 U.S. at 429-43 (plurality opinion). Justice Kennedy wrote a separate opinion concurring in the judgment. He agreed with the plurality that the zoning ordinance at issue should be analyzed under Renton, but he concurred in the judgment because he believed that "the plurality's application of Renton might constitute a subtle expansion, with which [he did] not concur." Id. at 445 (Kennedy, J., concurring in the judgment). Justice Souter dissented, and his opinion was joined by Justices Stevens, Ginsburg, and, in part, Breyer. Id. at 453-66 (Souter, J., dissenting). Because Justice Kennedy concurred in the judgment in Alameda Books on the narrowest grounds, his opinion represents the Supreme Court's holding in that case under Marks. Peek-A-Boo Lounge, 337 F.3d at 1264; accord SOB, Inc., 317 F.3d at 862 n.1; Ben's Bar, Inc., 316 F.3d at 722.

27

Lounge, 337 F.3d at 1269. To that end, a city need not "conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses." Alameda Books, 535 U.S. at 451 (Kennedy, J., concurring in the judgment) (quoting Renton, 475 U.S. at 51-52); see also id. at 438 (plurality opinion) ("[A] municipality may rely on any evidence that is reasonably believed to be relevant for demonstrating a connection between speech and a substantial, independent government interest." (quotation marks omitted)); Pap's A.M., 529 U.S. at 296 (plurality opinion) (quoting Renton's "reasonably believed to be relevant" language). Although a municipality "must rely on at least some pre-enactment evidence," such evidence can consist of "a municipality's own findings, evidence gathered by other localities, or evidence described in a judicial opinion." Peek-A-Boo Lounge, 337 F.3d at 1268; see, e.g., Pap's A.M., 529 U.S. at 300 (plurality opinion) (finding sufficient that "the city council relied on this Court's opinions detailing the harmful secondary effects caused by [adult] establishments . . ., as well as on its own experiences"); Barnes v. Glen Theatre, Inc., 501 U.S. 560, 584 (1991) (Souter, J., concurring in the judgment)[21]

_____

[21] Just as in Alameda Books and Pap's A.M., a majority of the Court in Barnes did not support a single rationale explaining the result. The plurality opinion written by Chief Justice Rehnquist, joined by Justices O'Connor and Kennedy, upheld the regulation under the O'Brien framework. Barnes, 501 U.S. at 569-72 (plurality opinion). Relevant here, the plurality found

28

(permitting a municipality to rely on prior judicial opinions); Renton, 475 U.S. at 51-52 (holding that the city was entitled to rely on the experiences of other cities and on a judicial opinion).

Once a city has provided evidence that it reasonably believed to be relevant to its rationale for enacting the ordinance, plaintiffs must be given the opportunity to "cast direct doubt on this rationale," either by demonstrating that the city's evidence does not support its rationale or by furnishing evidence that disputes the city's factual findings. Peek-A-Boo Lounge, 337 F.3d at 1265 (quoting Alameda Books, 535 U.S. at 438-39 (plurality opinion)); see, e.g., Pap's A.M., 529 U.S. at 298 (plurality opinion) (rejecting claim when plaintiff "never challenged the city council's findings or cast any specific doubt on the validity of those findings"). "If plaintiffs succeed in casting doubt on a municipality's rationale in either manner, the burden shifts back to the municipality to supplement the record with evidence

O'Brien's second prong satisfied by evidence that the regulation at issue "furthers a substantial government interest in protecting order and morality," which the plurality considered to be an interest "unrelated to the suppression of free expression." Id. at 569-70. Justice Scalia concurred in the judgment because, in his view, a general public nudity prohibition "is not subject to First Amendment scrutiny at all." Id. at 572 (Scalia, J., concurring in the judgment). Justice Souter also concurred in the judgment. Unlike Justice Scalia, he agreed with the plurality that the regulation should be analyzed under O'Brien. But Justice Souter "[wrote] separately to rest [his] concurrence in the judgment, not on the possible sufficiency of society's moral views to justify the limitations at issue, but on the State's substantial interest in combating the secondary effects of adult entertainment establishments." Id. at 582 (Souter, J., concurring in the judgment). As we have explained, "[b]ecause Justice Souter provided the narrowest grounds for the judgment of the Court in Barnes, his concurrence constitutes the holding of that case" under Marks. Peek-A-Boo Lounge, 337 F.3d at 1260; accord Heideman, 348 F.3d at 1197-98.

29

renewing support for a theory that justifies its ordinance." Alameda Books, 535

U.S. at 439 (plurality opinion) (citing Pap's A.M., 529 U.S. at 298 (plurality

opinion)); see also Peek-A-Boo Lounge, 337 F.3d at 1269.

Although the burden lies with the municipality, a court "should be careful

not to substitute its own judgment for that of the [municipality,]" and the

municipality's "legislative judgment should be upheld provided that [it] can show

that its judgment is still supported by credible evidence, upon which [it] reasonably

relies." Peek-A-Boo Lounge, 337 F.3d at 1273.

Here, the City of Daytona Beach plainly carried its initial burden to show

that the three challenged nudity ordinances furthered its interest in reducing the

negative secondary effects associated with adult theaters. The City has produced a

substantial body of evidence that it reasonably believed to be relevant to combating

those problems. Ordinance 81-334 prohibits nudity and sexual conduct in

establishments that serve alcohol. As the Ordinance itself says, the City's rationale

was to reduce the negative secondary effects associated with adult theaters:

> It is hereby found that the acts prohibited in [this ordinance] encourage the conduct of prostitution, attempted rape, rape, murder, and assaults on police officers in and around establishments dealing in alcoholic beverages, that actual and simulated nudity and sexual conduct and the depiction thereof coupled with alcohol in public places begets undesirable behavior, that sexual, lewd, lascivious, and salacious conduct among patrons and employees within establishments dealing in alcoholic beverages results in violation of

30

law and dangers to the health, safety and welfare of the public . . . .

Ordinance 81-334 § 2. To support this rationale, Ordinance 81-334 cites two

Supreme Court decisions, New York State Liquor Authority v. Bellanca, 452 U.S.

714 (1981) (per curiam), and California v. LaRue, 409 U.S. 109 (1972), both of

which upheld prohibitions on nude dancing in establishments that serve alcohol.

See Bellanca, 452 U.S. at 718 (upholding statute where the legislature had found

that "[c]ommon sense indicates that any form of nudity coupled with alcohol in a

public place begets undesirable behavior"); LaRue, 409 U.S. at 118-19 ("The . . .

conclusion . . . that certain sexual performances and the dispensation of liquor by

the drink ought not to occur at premises that have licenses was not an irrational

one.").

Although the City's reliance on these cases may be sufficient to carry the

City's initial burden, see Pap's A.M., 529 U.S. at 296-97 (plurality opinion)

(suggesting that a city can carry its initial burden by relying solely on relevant

Supreme Court cases), the legislative history of Ordinance 81-334 shows that the

City also relied on its own experiences to support its rationale. That legislative

history includes: a document describing the difficulties faced by law enforcement

in arresting and successfully prosecuting crimes relating to prostitution and

pornography and listing arrests for prostitution and other crimes that occurred in or

31

near many Daytona Beach adult businesses; a short memorandum written by the City's police chief that provides "a partial list of situations, offenses and incidents which have occurred within the areas of topless bar establishments . . . . [that] can be substantiated by police reports and testimony of various police officers"; police dispatch records of calls for service ("CAD data"[22]) from areas around adult businesses from November 1980 to July 1981, which were attached to the police chief's memorandum; police reports of eighty-three prostitution arrests; police reports of seven arrests for assault and battery of a police officer in or near an adult theater; and the minutes of a public hearing summarizing local business owners' firsthand accounts of criminal activity in and around adult businesses.

This legislative history supporting the enactment of Ordinance 81-334 is more than sufficient to carry the City's initial burden under O'Brien's second prong. See, e.g., Alameda Books, 535 U.S. at 452 (Kennedy, J., concurring in the judgment) (concluding that the city carried its initial burden with "a single study and common experience"); Pap's A.M., 529 U.S. at 297-98 (plurality opinion) (holding that the city's legislative findings were sufficient because "city council members, familiar with [the city's] commercial downtown . . ., are the individuals who would likely have had firsthand knowledge of what took place at and around

---

[22] "CAD" stands for Computer Automated Dispatch.

nude dancing establishments"); see also Peek-A-Boo Lounge, 337 F.3d at 1269-70.

As for Ordinances 02-496 and 03-375, the City likewise carried its initial burden of proof. Ordinance 02-496 was enacted as a general public nudity ordinance "to protect and preserve the health, safety and welfare" of the City's residents. Daytona Beach, Fla., Code § 62-181(a), enacted by Ordinance 02-496 § 14. The Ordinance sets forth the following findings: "The appearance of persons in the nude in public places . . . increases incidents of lewd and lascivious behavior, prostitution, sexual assaults and batteries, attracts other criminal activity to the community, encourages degradation of women, and facilitates other activities which break down family structures and values." Ordinance 02-496 § 5. To support these findings, the City relied on, among other things, newspaper articles describing incidents of public nudity and other criminal activity during Spring Break and Black College Reunion,[23] narrative reports by undercover detectives

_____

[23] See Henry Frederick, Police Chief: Spring Break, BCR Hurt Family Tourism, Daytona Beach News-Journal, Apr. 16, 2002 ("'Youth-oriented street festivals like BCR and Spring Break keep family tourism away.'"); Anne Geggis, Barter on the Beach: Beads for Breasts, Daytona Beach News-Journal, Mar. 24, 2002 ("Daytona Beach police confirm they've been seeing more than usual this year -- and issuing more $104 tickets for exposure of female breasts than at previous Spring Breaks. . . . 'Even the chief this (past) weekend witnessed it and moved to make an arrest of a mother and daughter on Atlantic Avenue,' says [a] spokesman for the Daytona Beach police." . . . Some are concerned the atmosphere is ripe for an incident like the New York City 'wilding' of 2000 during which women's clothes were torn off their bodies."); Audrey Parente, BCR 'Shocking' for Pennsylvania Sisters, Daytona Beach News-Journal, Apr. 15, 2002, at 6A ("'I saw guys exposing themselves,' Miller said. Schubert said she saw '. . . women in small clothes -- thongs and very exposing bras. . . .' Worse than the exposure, she said she saw drug use and drug sales. 'I saw a young man in a car in front of me smoking a joint and passing it from car to car. They were walking around on the road.'").

33

describing instances of sexual conduct, nudity, and violations of Ordinance 81-334 by dancers at adult theaters,[24] and the Supreme Court's decisions in Pap's A.M., 529 U.S. 277, and Barnes, 501 U.S. 560. As with Ordinance 81-334, the pre-enactment evidence for Ordinance 02-496 is sufficient for the City to carry its initial burden under O'Brien's second prong.

Ordinance 03-375 amended Ordinance 02-496 to allow erotic dancers to wear G-strings and pasties within an adult theater located more than 500 feet from an establishment that serves alcohol, but Ordinance 02-496's somewhat more restrictive clothing requirements[25] remain applicable within 500 feet of such an establishment. Daytona Beach, Fla., Code § 62-184(b), enacted by Ordinance 03-375 § 9. In support of Ordinance 03-375, the City relied on Mr. Langston's and

---

[24] For example, on March 8, 2002, several undercover investigators went to Lollipop's "to conduct a covert inspection of the activities" there:

> During this inspection, alcoholic beverages were being sold and consumed. . . . This writer observed bare breasted dancers performing "lap" dances involving simulated intercourse by the female dancer [who placed] her buttocks in the lap of the patron and began to manipulate her hips back and forth and up and down. While engaged in the previous activities, dancers would rub their bare breasts in the faces of the patrons and allow the patrons to lick and suck the breasts. . . . This writer observed every dancer to be in violation of the exposed breasts ordinance while alcohol was being served and consumed.

Daytona Beach Police Department, Florida Offense/Incident Report No. 0203103, at 1-2 (Mar. 11, 2002).

[25] See supra note 12.

Mr. Smith's testimony from <u>Function Junction, Inc.</u>, 705 F. Supp. 544.[26] As we have noted, Langston testified that live nude and seminude entertainment businesses "promote and perpetuate urban decay" and that "adult businesses have impacted on crime in the area surrounding Daytona Beach." <u>Id.</u> at 547. Smith, who as an assistant state attorney had prosecuted drug and prostitution offenses in Daytona Beach, concurred that "there were more drug and prostitution offenses in topless bars than in other bars." <u>Id.</u> at 548.

The City also relied on several controlled studies conducted by Dr. William George about the relationship between drinking alcohol and sexual conduct. Thus, for example, one study found that exposure to erotica led male subjects to drink more alcohol than did exposure to non-erotic materials.[27] Another study found that young men who believed they had consumed alcohol -- regardless of whether they had in fact done so -- displayed greater interest in viewing violent and/or erotic images and reported increased sexual arousal than young men who believed they had not consumed alcohol.[28] Still another study found that study participants

---

[26] Although <u>Function Junction</u> was a challenge to the City's zoning ordinances, 705 F. Supp. at 545, the City relied on testimony from that case in support of Ordinance 03-375.

[27] William H. George et al., <u>The Effects of Erotica Exposure on Drinking</u>, 1 Annals Sex Res. 79 (1988).

[28] William H. George & G. Alan Marlatt, <u>The Effects of Alcohol and Anger on Interest in Violence, Erotica, and Deviance</u>, 95 J. Abnormal Psych. 150 (1986).

perceived a woman they believed had consumed alcohol as being "significantly more aggressive, impaired, sexually available, and as significantly more likely to engage in foreplay and intercourse" than a woman whom study participants believed had not consumed alcohol.[29] Finally, Ordinance 03-375 expressly incorporates all of the evidence that the City previously had relied on to support Ordinances 81-334 and 02-496. The City's pre-enactment evidence for Ordinance 03-375 is sufficient to carry the City's initial burden under O'Brien's second prong.

Because the City carried its initial burden, the district court properly gave Lollipop's the opportunity to "cast direct doubt" on the City's rationale, either by demonstrating that the City's evidence does not support its rationale or by furnishing evidence that disputes the City's factual findings. See Pap's A.M., 529 U.S. at 298 (plurality opinion); Peek-A-Boo Lounge, 337 F.3d at 1265; see also Alameda Books, 535 U.S. at 438-39 (plurality opinion). To this end, as we have noted, two expert witnesses testified that the City's pre-enactment evidence consisted of "shoddy," "meaningless," and "unreliable" data and that its reasoning was equally "shoddy." The experts explained that the City provided no empirical data to support the conclusion that prostitution and other crimes occurred more

---

[29] William H. George et al., Perceptions of Postdrinking Female Sexuality: Effects of Gender, Beverage Choice, and Drink Payment, 1988 J. Applied Soc. Psych. 1295, 1295.

frequently in and around adult theaters than elsewhere, and that the CAD data and police reports lacked reliability because they did not cover all of the areas where adult theaters are located in Daytona Beach and contained no comparison data from other areas of the City against which the incidents occurring in and around adult theaters could be measured. Similarly, Lollipop's experts said that the narrative reports of undercover law enforcement and the testimony from Function Junction about urban blight and crime being found around adult theaters lacked comparative data, did not cover a sufficient period of time to rule out momentary fluctuations, and were merely the result of stepped-up law enforcement. (Experts' Report 62-63, 161-63.) The experts also observed that Dr. George's studies were conducted in controlled laboratory settings, and, therefore, the experts opined, the studies' conclusions could not be generalized to the "real world situation of alcoholic beverage consumption in an adult nightclub that features topless or nude entertainment." (Id. at 167-68.)

To buttress their critique of the City's evidence, Lollipop's experts conducted two empirical studies. The first study analyzed CAD data provided by the City for the forty-four months preceding Ordinance 81-334's enactment "to examine the relationship between the presence of adult cabarets in areas and the rates of crime in those areas." (Id. at 3.) The experts compared CAD data from

37

areas that had adult theaters to control areas that did not and "found no statistically significant differences in overall rates of crime between study and control areas." (Id. at 4.) They concluded that their empirical study "cast grave doubt on the findings of the City Commission that the combination of nude (topless) dancing and alcohol increase[s] 'rape, attempted rape, murder, and assaults on police officers.'" (Id. at 2 (quoting Ordinance 81-334 § 2).)

The second empirical study focused on the City's rationale for Ordinances 02-496 and 03-375 and examined CAD data from March 1999 to April 2003. This study compared the presence of an adult theater to other "demographic variables previously used by criminologists and found to be related to criminal activity, such as a local area's population, age structure (especially the presence of young adults)," "race/ethnic composition," "housing vacancies," "female-headed households," and "the number of alcohol retail sale establishments." (Id. at 56; see also id. at 186.) Based on their statistical analysis, Lollipop's experts concluded that these other variables "were statistically strongly related to crime events," whereas the presence of an adult theater "accounted for an insubstantial amount" of crime in the relevant area. (Id. at 56 (emphasis omitted); see also id. at 186-87.) The experts concluded that only 1-3.5% of the criminal activity within a 1000-foot radius of adult theaters could be attributed to the theaters, and that adult theaters

accounted for zero or near-zero percent of the sex crime activity in their near vicinity. (Id. at 57.)

The district court agreed with Lollipop's experts that the City's pre-enactment evidence for all three nudity ordinances was "shoddy" and "meaningless." It concluded that Lollipop's had succeeded in casting direct doubt on the City's rationale for each ordinance and declared all three nudity ordinances unconstitutional. The district court said that Lollipop's experts' "scientific" studies cast direct doubt on the City's "anecdotal" evidence primarily because the court read the Supreme Court's decision in Alameda Books and our opinion in Peek-A-Boo Lounge to have "raised the bar somewhat" on Renton's "reasonably believed to be relevant" standard. (Dist. Ct. Am. Order 9-10.)

In Alameda Books, the plurality explained the Renton standard this way:

> In Renton, we specifically refused to set such a high bar for municipalities that want to address merely the secondary effects of protected speech. We held that a municipality may rely on any evidence that is 'reasonably believed to be relevant' for demonstrating a connection between speech and a substantial, independent government interest.

Alameda Books, 535 U.S. at 438 (plurality opinion) (quoting Renton, 475 U.S. at 51-52). But the plurality then warned: "This is not to say that a municipality can get away with shoddy data or reasoning. The municipality's evidence must fairly support the municipality's rationale for its ordinance." Id. Although Justice

39

Kennedy's opinion, not the plurality, is the holding in <u>Alameda Books</u>, we quoted

the plurality's "shoddy data" and "fairly supports" language several times in

<u>Peek-A-Boo Lounge</u>. 337 F.3d at 1262-63, 1265, 1266, 1269.

We do not agree, however, with Lollipop's claim that either <u>Alameda Books</u>

or <u>Peek-A-Boo Lounge</u> raises the evidentiary bar or requires a city to justify its

ordinances with empirical evidence or scientific studies. Justice Kennedy's

<u>Alameda Books</u> concurrence, which all parties agree states the holding of that case

under the rationale explained in <u>Marks v. United States</u>, 430 U.S. 188, 193 (1977),

emphasized that the evidentiary standard announced in <u>Renton</u> remained sound:

> [W]e have consistently held that a city must have latitude to experiment, at least at the outset, and that very little evidence is required. "The First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, <u>so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses</u>."

<u>Alameda Books</u>, 535 U.S. at 451 (Kennedy, J., concurring in the judgment)

(quoting <u>Renton</u>, 475 U.S. at 51-52 (emphasis added)).[30]

---

[30] Even if the plurality had constituted the actual holding in <u>Alameda Books</u>, the plurality also reaffirmed <u>Renton</u>'s continued validity and explicitly refused to raise cities' evidentiary burden. To the contrary, the plurality <u>criticized</u> Justice Souter's dissent for "rais[ing] the evidentiary bar" by "ask[ing] the city to demonstrate, not merely by appeal to common sense, but also with empirical data, that its ordinance will successfully lower crime." <u>Alameda Books</u>, 535 U.S. at 439-41 (plurality opinion) (emphasis added). The plurality explicitly rejected this requirement because it "would go too far in undermining our settled position that municipalities must be given a 'reasonable opportunity to experiment with solutions' to address the secondary effects of protected speech." <u>Id.</u> at 439.

Our opinion in Peek-A-Boo Lounge is consistent with Justice Kennedy's concurrence in Alameda Books and with Renton. There, a panel of this Court held that "[t]o satisfy Renton, any evidence 'reasonably believed to be relevant' -- including a municipality's own findings, evidence gathered by other localities, or evidence described in a judicial opinion -- may form an adequate predicate to the adoption of a secondary effects ordinance," Peek-A-Boo Lounge, 337 F.3d at 1268, and we remanded that case with specific instructions to uphold the ordinance "provided that the County['s] . . . judgment is still supported by credible evidence, upon which [it] reasonably relies," id. at 1273 (emphasis added).

Here, Lollipop's argument that the City's evidence is flawed because it consists of "anecdotal" accounts rather than "empirical" studies essentially asks this Court to hold today that the City's reliance on anything but empirical studies based on scientific methods is unreasonable. This was not the law before Alameda Books, and it is not the law now. See Alameda Books, 535 U.S. at 451 (Kennedy, J., concurring in the judgment) (reiterating that a city need not "conduct new studies or produce evidence independent of that already generated by other cities" (quoting Renton, 475 U.S. at 51-52)); Pap's A.M., 529 U.S. at 300 (plurality opinion) (criticizing the dissent for "ignor[ing] Erie's actual experience and instead requir[ing] . . . an empirical analysis"). Rather, the City of Daytona Beach could

41

reasonably rely upon "[c]ommon sense," see Bellanca, 452 U.S. at 718, "its own experiences," see Pap's A.M., 529 U.S. at 300 (plurality opinion), "the experiences of . . . other cities," Renton, 475 U.S. at 51, or city officials' local knowledge, see Alameda Books, 535 U.S. at 451-52 (Kennedy, J., concurring in the judgment) ("The Los Angeles City Council knows the streets of Los Angeles better than we do. It is entitled to rely on that knowledge . . . ." (citations omitted)); see also Pap's A.M., 529 U.S. at 297-98 (plurality opinion).

To be sure, as the Alameda Books plurality admonished, the City cannot "get away with shoddy data or reasoning," and its evidence must "fairly support" its rationale. See 535 U.S. at 438 (plurality opinion). But this is simply another way of saying that the City's reliance on evidence supporting its rationale must be reasonable. Anecdotal evidence is not "shoddy" per se. At most, Lollipop's experts' studies suggest that the City could have reached a different conclusion during its legislative process about the relationship between adult theaters and negative secondary effects. But demonstrating the possibility of such an alternative does not necessarily mean that the City was barred from reaching other reasonable and different conclusions. See G.M. Enters., Inc. v. Town of St. Joseph, 350 F.3d 631, 639 (7th Cir. 2003) ("Although this evidence shows that the [town] might have reached a different and equally reasonable conclusion regarding the

42

relationship between adverse secondary effects and sexually oriented businesses, it is not sufficient to vitiate the result reached in the [town's] legislative process."); see also Alameda Books, 535 U.S. at 437 (plurality opinion) (noting that a city "does not bear the burden of providing evidence that rules out every theory . . . that is inconsistent with its own").

Our review is designed to determine whether the City's rationale was a reasonable one, and even if Lollipop's demonstrates that another conclusion was also reasonable, we cannot simply substitute our own judgment for the City's. See Peek-A-Boo Lounge, 337 F.3d at 1273; see also Barnes, 501 U.S. at 583 (Souter, J., concurring in the judgment) ("At least as to the regulation of expressive conduct, '[w]e decline to void [a statute] essentially on the ground that it is unwise legislation . . . .'" (quoting O'Brien, 391 U.S. at 384 (alterations in original))); Renton, 475 U.S. at 52 ("It is not our function to appraise the wisdom of [the city's] decision to [regulate] adult theaters . . . ." (second alteration added and quotation marks omitted)); cf. Alameda Books, 535 U.S. at 451 (Kennedy, J., concurring in the judgment) ("[C]ourts should not be in the business of second-guessing fact-bound empirical assessments of city planners.").

The City of Daytona Beach relied on, among other things, the Supreme Court's decisions in Bellanca, LaRue, Barnes, and Pap's A.M.; numerous police

43

reports of criminal activity -- including prostitution and assaults on police officers -- in and around adult theaters; undercover police investigations that revealed numerous violations of City ordinances by adult theaters; the City's police chief's documentation of criminal activity in and around adult theaters; CAD data showing calls-for-service to police dispatchers from areas near adult theaters; extensive testimony taken in Function Junction, 705 F. Supp. at 547-48; studies conducted by Boston and Detroit showing that adult businesses tend to increase urban blight; studies of urban blight and decay in Daytona Beach; controlled laboratory studies showing a correlation between alcohol and sexual conduct; anecdotal accounts from local business owners about increased crime in and around adult theaters; and newspaper articles describing increases in problems related to nudity and alcohol surrounding events such as Spring Break and Black College Reunion. Because Lollipop's has failed to cast direct doubt on the aggregation of evidence that the City reasonably relied upon when enacting the challenged ordinances, we hold that the ordinances further a substantial government interest under O'Brien.

Moreover, a close examination of Lollipop's experts' studies calls into question their stated conclusion that they "cast grave doubt" on the City's evidence that adult theaters increase crime, and, equally important, the studies do not even purport to address the City's evidence that adult theaters tend more generally to

perpetuate urban blight and decay. First, one underlying methodological problem with both studies suggests that they cast little or no doubt on the City's evidence that nudity in establishments that serve alcohol encourages "prostitution, . . . undesirable behavior . . ., [and] sexual, lewd, lascivious, and salacious conduct among patrons and employees . . . in violation of law and [en]dangers . . . the health, safety and welfare of the public." See Ordinance 81-334 § 2. The experts' studies are based solely on CAD data, which, in lay terms, is essentially 911 emergency call data. Relying on such data to study crime rates is problematic, however, because many crimes do not result in calls to 911, and, therefore, do not have corresponding records in the City's CAD data.[31] This is especially true for crimes, such as lewdness[32] and prostitution, that the City sought to reduce by enacting the challenged ordinances. See Ordinance 02-496 § 5 (seeking to reduce "lewd and lascivious behavior, prostitution, sexual assaults and batteries, . . . other criminal activity, [and the] degradation of women"); Ordinance 81-334 § 2

---

[31] See Richard McCleary & James W. Meeker, Do Peep Shows "Cause" Crime? A Response to Linz, Paul, and Yao, 43 J. Sex Res. 194, 196 ("Modern criminologists do not use CFSs [i.e., calls for service or CAD data,] to measure crime or crime risk. In 2000-2004, the official journals of the two national criminology professional associations, Criminology and Justice Quarterly, published 245 articles. Of the 100 that analyzed a crime-related statistic, . . . [only] two analyzed CFSs, but even in these two cases, CFSs were not used to measure crime or crime risk.").

[32] Under Florida law, lewdness is at least a second-degree misdemeanor. See Fla. Stat. § 796.07.

(seeking to reduce "prostitution, . . . undesirable behavior, . . . [and illegal] sexual, lewd, lascivious, and salacious conduct among patrons and employees" of adult theaters); see also Ordinance 03-375 § 4 (relying on legislative record for Ordinances 81-334 and 02-496).

Such crimes are often "victimless," in the sense that all of those involved are willing participants, and, therefore, they rarely result in calls to 911. College students on Spring Break are unlikely to call 911 after a wild night out on the town despite having participated in exactly the sort of activity that the City's nudity ordinances were enacted to reduce. Likewise, an encounter between a prostitute and a "john" rarely leads to a 911 call. By contrast, the City's "anecdotal" evidence may be a more accurate assessment of such crimes because it is not based on a data set that undercounts the incidents of such "victimless" crimes. Cf. World Wide Video of Wash., Inc. v. City of Spokane, 368 F.3d 1186, 1195-96 (9th Cir. 2004) ("Anecdotal evidence and reported experience can be as telling as statistical data and can serve as a legitimate basis for finding negative secondary effects." (citation and alteration omitted)).[33]

_____

[33] We also note that at least three other circuits have rejected, for similar reasons, attempts by plaintiffs to use studies based on CAD data to cast direct doubt on an ordinance that the municipality supported with evidence of the sort relied upon by the City of Daytona Beach here. See Gammoh v. City of La Habra, 395 F.3d 1114, 1126-27 (9th Cir. 2005); G.M. Enters., Inc., 350 F.3d at 639; SOB, Inc., 317 F.3d at 863 & n.2. Interestingly, Daniel Linz, one of the experts hired by Lollipop's, also co-authored the studies found to be insufficient in two of these cases. See G.M. Enters., Inc., 350 F.3d at 635-36, 639; SOB, Inc., 317 F.3d at 863.

A second problem with Lollipop's experts' studies is that, even if the underlying CAD data fully reflected all of the conduct that Daytona Beach sought to reduce, the experts appear to draw conclusions that overstate the underlying data. For example, the study that focuses on Ordinance 81-334 concludes that "crimes against persons, crimes against property, and sex crimes, including both rape and prostitution[,] are not more common in areas with adult businesses than they are in similar control areas." (Experts' Report 2.) But the experts' own underlying data suggests otherwise -- for three of the six pairs of study and control areas that the experts examined, "the study areas [i.e., areas with adult theaters,] do show significantly higher rates of crime than the control areas." (Id. at 29-30 (emphasis added).)

The experts attempt to explain away this result by pointing to the other three pairs -- two show no "significant" difference between study and control areas, and one shows a significantly higher crime rate in the control area than the study area. The experts assert, without much discussion, that "[t]his mixed pattern" shows that "factors other than the presence of a nude cabaret are affecting rates of crime." (Id. at 30.) The experts are no doubt correct that factors other than the presence of adult theaters affect crime rates in Daytona Beach; crime is plainly caused by many factors. But that does little to undermine the City's conclusion that adult theaters

also affect crime rates, especially when the experts' own analysis shows a statistically significant correlation between adult theaters and increased crime in half of the areas in the study.[34]

Finally, both studies focus only on criminal activity and do not even purport to address the connection between adult theaters and urban blight. Ordinance 03-375, which amended Ordinance 02-496, was supported by testimony from Function Junction that adult theaters promote and perpetuate urban blight, which in Daytona Beach was characterized by "a significant percentage of deteriorating structures; a large number of small . . . lots, which did not allow cars; a notable parking problem; a high incidence of crime, particularly, on the beachside; and a large percentage of antiquated, underground utility systems, such as drainage, water and sewer systems." 705 F. Supp. at 547. Lollipop's experts' studies examine only one of these conditions -- high crime rates -- and, notably, do not address at all the City's evidence that adult theaters tend to perpetuate these other

---

[34] In addition to crimes against persons, crimes against property, and sex crimes, the study that focused on Ordinance 81-334 also analyzed "miscellaneous incidents that share in common that they involve violations of social norms . . . ., includ[ing] drunkenness, disorderly conduct, drug offenses, liquor law violations, and weapons complaints." (Experts' Report 27.) The study found a statistically significant increase in these so-called "norm violations" in areas with adult theaters compared to control areas, (id. at 33-34), which could be read to support part of the City's rationale for Ordinance 81-334. See Ordinance 81-334 § 2 (seeking to reduce "undesirable behavior" and "dangers to the health, safety and welfare of the public"). Similarly, the study that focused on Ordinance 02-496 found a statistically significant increase in drug related offenses in areas with adult theaters compared to control areas. (Experts' Report 80, 105 tbl.10.)

features of urban blight. Although Lollipop's experts argue that the testimony provided in Function Junction was based on unreliable data and methodologically unsound analysis, we repeat that the City's reliance on such evidence need only have been reasonable, and it was.

In short, the CAD data relied on by both studies may substantially undercount incidents of many of the types of crime that the City sought to reduce; the data that the studies did analyze show some statistically significant correlations between adult theaters and increased criminal activity; and the studies completely fail to address evidence of increased urban blight and decay that the City reasonably relied on when enacting Ordinance 03-375. Thus, Lollipop's has failed to cast direct doubt on all of the evidence that the City reasonably relied on when enacting the challenged ordinances. See Peek-A-Boo Lounge, 337 F.3d at 1268 (noting that "the government must rely on at least some pre-enactment evidence" (emphasis in original)); Wise Enters., Inc. v. Unified Gov't of Athens-Clarke County, 217 F.3d 1360, 1364 (11th Cir. 2000) (noting that a municipality "must have some factual basis" for its rationale (emphasis in original) (quotation marks omitted)); see also World Wide Video, 368 F.3d at 1195 (explaining that a city needs only "some" evidence to support its ordinances); Baby Dolls Topless Saloons, Inc. v. City of Dallas, 295 F.3d 471, 481 (5th Cir. 2002) ("Renton teaches

49

us that the government must produce <u>some</u> evidence of adverse secondary effects .

. . ." (emphasis in original) (citation omitted)). Accordingly, we hold that

Ordinances 81-334, 02-496, and 03-375 further a substantial government interest

under <u>O'Brien</u>.[35]

*B. Narrow Tailoring*

Under the fourth prong of the <u>O'Brien</u> test, an ordinance that imposes a

reasonable time, place, or manner restriction on nudity must be "no greater than is

essential to the furtherance of the government interest." <u>Pap's A.M.</u>, 529 U.S. at

301 (plurality opinion). The Supreme Court has made clear, however, that <u>O'Brien</u>

does not impose strict scrutiny's familiar "least restrictive means" requirement:

> Lest any confusion on the point remain, we reaffirm today that a
> regulation of the time, place, or manner of protected speech must be
> narrowly tailored to serve the government's legitimate,
> content-neutral interests but that it need not be the least restrictive or
> least intrusive means of doing so. Rather, the requirement of narrow
> tailoring is satisfied "so long as the . . . regulation promotes a
> substantial government interest that would be achieved less effectively
> absent the regulation."

<u>Ward v. Rock Against Racism</u>, 491 U.S. 781, 798-99 (1989) (footnote and citation

---

[35] Inasmuch as the district court concluded that Lollipop's had cast direct doubt on the
City's evidence, it allowed the City to present post-enactment evidence in an effort to renew
support for a theory justifying its ordinances. But because we have concluded that Lollipop's
failed to cast direct doubt on the City's evidence, there is no need to consider the City's
post-enactment evidence. <u>See</u> <u>Alameda Books</u>, 535 U.S. at 438-39 (plurality opinion) ("If
plaintiffs fail to cast direct doubt on [the city's] rationale . . ., the municipality meets the
standard set forth in <u>Renton</u>.").

omitted) (alteration in original)); see also Pap's A.M., 529 U.S. at 301-02 (plurality opinion) (noting that "least restrictive means analysis is not required" under O'Brien).

Here, the combined effect of Ordinances 81-334, 02-496, and 03-375 is that at least G-strings and pasties are required in all adult theaters regardless of location, and that Ordinance 02-496's slightly more modest clothing requirements apply at establishments that either serve alcohol or are located within 500 feet of an establishment that serves alcohol. Lollipop's argues that requiring more than G-strings and pasties at establishments that serve alcohol imposes a greater restriction than is necessary to further the City's substantial interest in reducing negative secondary effects:

> Appellants are claiming, at a minimum, that adults have a right to perform in pasties and G-strings where alcohol is served. Appellants further argue that the City's ordinances are unduly restrictive because they should allow pasties and G-strings at more locations. Appellants' claim should be understood in the broadest terms: government simply has no business telling adults what they can and cannot wear beyond a simple prohibition against nudity.

(Appellants'/Cross Appellees' Resp. & Reply Br. 22-23 (emphasis in original).)

We break no new ground in rejecting Lollipop's argument. It is well-established that a nudity ordinance that imposes a minimum requirement of G-strings and pasties is narrowly tailored under O'Brien. See Pap's A.M., 529 U.S.

at 301 (plurality opinion) ("The requirement that dancers wear pasties and G-strings is a minimal restriction in furtherance of the asserted government interests, and the restriction leaves ample capacity to convey the dancer's erotic message."); Barnes, 501 U.S. at 587 (Souter, J., concurring in the judgment) ("Pasties and a G-string moderate the expression to some degree, to be sure, but only to a degree. Dropping the final stitch is prohibited, but the limitation is minor when measured against the dancer's remaining capacity and opportunity to express the erotic message."); id. at 572 (plurality opinion) ("Indiana's requirement that the dancers wear at least pasties and G-strings is modest, and the bare minimum necessary to achieve the State's purpose."); cf. Peek-A-Boo Lounge, 337 F.3d at 1274 (suggesting that the ordinance at issue, which did not leave erotic dancers free to perform wearing G-strings and pasties in any location in the county, was not narrowly tailored).

So too, the First Amendment does not prevent a city from limiting the venues where dancers may communicate their erotic message. An ordinance that "does not prohibit all nude dancing, but only restricts nude dancing in those locations where the unwanted secondary effects arise," is narrowly tailored. Wise Enters., 217 F.3d at 1365. And an ordinance that defines those locations by reference to the presence of establishments that serve alcohol does not unduly

restrict the ability to communicate an erotic message. See Grand Faloon Tavern, Inc. v. Wicker, 670 F.2d 943, 948 (11th Cir. 1982) ("[N]ude entertainment necessarily involves a substantial degree of conduct, and . . . any artistic or communicative elements present in such conduct are not of a kind whose content or effectiveness is dependent upon being conveyed where alcoholic beverages are served."). Thus, both the requirement that dancers wear G-strings and pasties in all adult theaters, and the additional requirement of clothing somewhat more modest[36] within 500 feet of establishments that serve alcohol, are narrowly tailored under O'Brien.

## IV.  Conclusion

Accordingly, we hold that all of the City's ordinances challenged in this lawsuit are constitutional. We AFFIRM the district court's decision upholding the City's zoning ordinances; we REVERSE the district court's decision striking down Ordinances 81-334, 02-496, and 03-375; and we REMAND for further proceedings consistent with this opinion.

---

[36] Lollipop's characterizes the additional required clothing as a "modest bikini," (Appellant's Initial Br. 46), or a "full bathing suit[]" (Appellant's Reply Br. 23). The City disputes this characterization, observing that "[a] 'modest bikini' certainly does not expose half of the lower female breast and two thirds of the buttocks." (Appellee's Initial Br. 52-53.) Regardless of whether the term "modest" accurately describes Ordinance 03-375's precise requirements, which are quoted above, see supra note 12, the City of Daytona Beach could impose those requirements within 500 feet of establishments that serve alcohol.

**AFFIRMED IN PART, REVERSED IN PART, and REMANDED**.